**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **CHAPTER 11** |
| | : | |
| **ROOSEVELT INN, LLC and** | : | **Bky. No. 21-11697(AMC)** |
| **ROOSEVELT MOTOR INN, INC.** | : | |
| | : | **JOINTLY ADMINISTERED** |
| **Debtors** | : | |
| | : | |

---

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF SECOND
AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY ROOSEVELT INN,
LLC AND ROOSEVELT MOTOR INN, INC., DEBTORS-IN-POSSESSION**

---

**KARALIS PC**
Aris J. Karalis
Robert W. Seitzer
Robert M. Greenbaum
1900 Spruce Street
Philadelphia, PA 19103
(215) 546-4500

*Attorneys for the Debtors
and Debtors in Possession*

Dated: August 15, 2023

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................2

BACKGROUND .................................................................................................................3

ARGUMENT ......................................................................................................................7

    I.    The Third-Party Release and Channeling Injunction Should Be
         Approved................................................................................................................8

         A.    This Court Has Subject-Matter Jurisdiction to Confirm a
               Plan that Contains the Third-Party Release and Channeling
               Injunction. ..............................................................................................10
               1.    "Arising Under" Jurisdiction ......................................................11
               2.    "Arising In" Jurisdiction ............................................................11
               3.    "Related to" Jurisdiction ............................................................12

         B.    This Court Has Both Constitutional Authority and Statutory
               Authority to Enter a Confirmation Order Approving the
               Third-Party Release and Channeling Injunction in the Plan......................16

         C.    The Third-Party Release and Channeling Injunction Are
               Appropriate Under the Unique and Extraordinary
               Circumstances of this Case ......................................................................17
                1.    Identity of Interest.......................................................................19
                2.    Substantial Contributions............................................................20
                3.    Essential to the Reorganization...................................................24
                4.    Significant Creditor Support ........................................................25
                5.    The Plan Provides a Mechanism for Payment of All
                       or Substantially All Affected Claims...........................................26
                6.    The Debtor Has Met Its Factual Burden Under
                       *Continental* and the Third-Party Release and
                       Channeling Injunction Should be Authorized..............................26

         D.    The Debtors' Releases .............................................................................30

    II.    The Plan Satisfies the Remaining Requirements for Confirmation
         Under Section 1129(a) of the Bankruptcy Code....................................................32

         A.    Section 1129(a)(1):  The Plan Complies with Applicable
               Provisions of the Bankruptcy Code ..........................................................32
                1.    Claims and Interests Have Been Classified Properly
                       in the Plan in Accordance with Section 1122 of the
                       Bankruptcy Code .........................................................................32

2.  The Plan Complies with Section 1123(a) of the
    Bankruptcy Code .................................................................35
3.  The Plan Complies with Section 1123(b) of the
    Bankruptcy Code .................................................................39
4.  Section 1123(b)(6):  The Discretionary Provisions
    Under the Plan Should Be Approved .............................................43

B.    Section 1129(a)(2):   The Debtor's Compliance with
Applicable Provisions of the Bankruptcy Code ........................................46
1.    Section 1125: Postpetition Disclosure Statement and
      Solicitation ..................................................................46
2.    Section 1126:  Acceptance of the Plan .........................................47

C.    Section 1129(a)(3):  The Plan Has Been Proposed in Good
Faith ...............................................................................48

D.    Section 1129(a)(4):  The Payment for Certain Services or for
Certain Costs and Expenses is Subject to Court Approval ..............................50

E.    Section 1129(a)(5):  The Debtor Has Disclosed Information
Regarding the Reorganized Debtors' Officer and Directors .............................51

F.    Section 1129(a)(6):   The Plan Does Not Require
Governmental Regulatory Approval of a Rate Change ...................................52

G.    Section 1129(a)(7):   The Best Interests Test Has Been
Satisfied ...........................................................................52

H.    Section 1129(a)(8):  All Impaired Classes Have Accepted
the Plan ............................................................................53

I.    Section 1129(a)(9):  The Plan Provides for Payment in Full
of Allowed Administrative and Priority Claims .......................................54

J.    Section 1129(a)(10):   At Least One Impaired Class of
Claims Has Accepted the Plan ........................................................54

K.    Section 1129(a)(11):  The Plan if Feasible .................................55

L.    Section 1129(a)(12):  The Plan Provides for Full Payment of
Statutory Fees ......................................................................56

M.    Sections 1129(a)(13)-(16) Are Inapplicable .................................57

III.    Debtors' Omnibus Reply to Plan Confirmation Objections filed by
Insurance Companies ..................................................................................58

    A.    The Plan is Insurance Neutral ...................................................59

    B.    The Plan does not improperly vest the Bankruptcy Court
with jurisdiction on non-core, state law coverage
discrimination ............................................................................66

    C.    The Plan's language regarding STAC's powers is not
ambiguous, nor inconsistent, with the Settlement Trust
Agreement and the settlement standard set forth in the
Settlement Trust Agreement is appropriate under the
circumstances of these Chapter 11 Cases ..................................68

CONCLUSION.......................................................................................................71

RESERVATION OF RIGHTS .................................................................................71

## TABLE OF AUTHORITIES

### Cases

*203 N. LaSalle II*,
    526 U.S. 434 (1999) ........................................................................................52

*Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*,
    258 B.R. 119 (D.N.J. 2000) ...........................................................................42

*Briscoe Enterprises Ltd., II.*,
    994 F.2d 1160 (5th Cir. 1993) .......................................................................55

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995)........................................................................10, 12, 13

*CoreStates Bank, N.A. v. United Chem. Techs., Inc.*,
    202 B.R. 33 (E.D. Pa. 1996) ..........................................................................55

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000)..........................................10, 17, 18, 23, 26, 45

Global Industrial Technologies, Inc.,
    645 F.3d 201 (3d Cir. 2011)...........................................................................62

*In re AAI Pharma*,
    No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) ....................................30

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 40 (Bankr. S.D.N.Y. 2007).................................................35, 55, 56

*In re Aleris Int'l, Inc.*,
    Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...............30

*In Am. Apparel, Inc.*,
    No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331 (Bankr. D. Del. Jan. 27, 2016)..............45

*In re Am. Family Enters.*,
    256 B.R. 377 (D.N.J. 2000) ...........................................................................21

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (D. Del. 2006)...................................................24, 33, 34, 35, 55

*In re Blitz U.S.A., Inc.*,
    No. 11-13603 (PJW), 2014 WL 2582976 (Bankr. Dec. 19, 2013) ...................... 19, 21, 27

*In re Boy Scouts of Am. et el.*,
    642 B.R. 504, (Bankr. D. Del. 2022) ................................................... 13, 16, 25, 27, 59, 62

*In re Capmark Fin. Grp. Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ................................................................ 42

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ........................................................ 45, 49

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ................................................................ 41

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3rd Cir. 2004) ........................................................................ 12

*In re DBDS North America, Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009) .............................................................. 30

*In re Dow Corning Corp.*,
    86 F.3d 482 (6th Cir. 1996) ........................................................................... 12

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ......................................................... 33, 45

*In re Drug Fair Grp., Inc.*,
    No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984 (Bankr. D. Del. June 7, 2010) .............. 45

*In re Dycoal, Inc.*,
    327 B.R. 220 (W.D. Pa. 2005) ....................................................................... 66

*In re Fed.-Mogul Global Inc.*,
    No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940 (Bankr. D. Del Nov. 8, 2007) ............... 24

*In re Freedom Rings, LLC*,
    No. 05-14268 (CSS) (Bankr. D. Del. May 9, 2006) ........................................... 11

*In re Hibbard Brown & Co.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) ............................................................... 42

*In re HRI Holding Corp.*,
    No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) ......................................... 45

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ....................................................................18, 20, 55

*In re Insys Therapeutics, Inc.*,
    No. 19-11292 (Bankr. D. Del.) (KG) ...............................................................................23

*In re Kaiser Aluminum Corp.*,
    No. 02-10429 (JKF), 2006 Bankr. LEXIS 3945 (Bankr. D. Del. Feb. 6, 2006)...............24

*In re Lapworth*,
    No. 97-34529, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) ...................................46

*In re Louise's Inc.*,
    211 B.R. 798 (Bankr. D. Del. 1997) .....................................................................41, 42, 70

*In re Mallinckrodt PLC.*,
    Case No. 20-12522-JTD (Bankr. D. Del. Feb. 3, 2022) ......................16, 23, 24, 52, 53, 59

*In re Marvel Entm't Grp., Inc.*,
    222 B.R. 243 (D. Del. 1998).........................................................................................42, 70

*In re Masonite Corp.*,
    No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698 (Bankr. D. Del. May 29, 2009)............45

*In re Millennium Lab Holdings II, LLC*,
    562 B.R. 614 (Bankr. D. Del. 2016) ................................................................................10

*In re Millennium Lab Holdings II, LLC*,
    575 B.R. 252 (Bankr. D. Del. 2017) ....................................................................11, 18, 21

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019).........................................................11, 16, 17, 24, 26, 27, 59

*In re Natural Products Grp., LLC*,
    No. 10-10239 (BLS), 2010 WL 2745983 (Bankr. D. Del. Feb. 22, 2010).......................46

*In re NII Holdings*,
    288 B.R. 356 (Bankr. D. Del. 2002) ................................................................................55

*In re Nutraquest*,
    434 F.3d 639 (3d. Cir. 2006)............................................................................................71

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) .....................................................................41, 42, 70

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1102 (3d Cir. 1979)............................................................................................41

*In re Prussia Assocs.*,
    322 B.R. 573 (Bankr. E.D. Pa. 2005) ...............................................................55

*In re Purdue Pharma, L.P.*,
    633 B.R. 58 (Bankr. S.D.N.Y. 2021) ...............................................................27

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)....................................................................44, 48

*In re Regent Commc'ns, Inc.*,
    No. 10-10632 (KG), 2010 Bankr. LEXIS 5793 (Bankr. D. Del. Apr. 12, 2010) .............45

*In re Resorts Int'l, Inc.*,
    327 F.3d 154 (3d Cir. 2004)............................................................................12

*In re rue21, Inc.*,
    575 B.R. 314 (Bankr. W.D. Pa. 2017) ..............................................................20

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ..............................................................41

*In re Sea Launch Co., L.L.C.*,
    No. 09-12153, 2010 Bankr. LEXIS 5283 (Bankr. D. Del. July 30, 2010) .......................58

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999)............................................................................48

*In re Stallion Oilfield Servs.*,
    No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500 (Bankr. D. Del. Jan. 20, 2010)............. 45

*In re Sun Country Dev., Inc.*,
    764 F.2d 406 (5th Cir. 1985) ...........................................................................48

*In re T-H New Orleans Ltd. P'Ship*,
    116 F.3d 790 (5th Cir. 1997) ...........................................................................55

*In re T.K. Holdings, Inc.*,
    No. 17-011375 (BLS) (Bankr. D. Del. Feb. 21, 2018) .........................................23, 25, 45

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................................55

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)................................................................46

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) ...............................................................18, 19, 33, 34

*In re U.S. Mineral Prods. Co.*,
No. 01-2471 (JKF), 2005 Bankr. LEXIS 3259 (Bankr. D. Del. Nov. 29, 2005)...............35

*In re U.S. Truck Co.*,
47 B.R. 932 (E.D. Mich.) 1985) .......................................................................................55

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012)...............................................................33, 34, 35, 42, 48, 49

*In re Washington Mutual Inc.*,
42 B.R. 314 (Bankr. D. Del. 2011) ............................................................................20, 42

*In re Weinstein Co. Holdings, LLC*,
Case No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021).......................................25, 27

*In re WorldCom, Inc.*,
No 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) ...............50, 55

*In re WorldCom, Inc.*,
401 B.R. 637 (Bankr. S.D.N.Y. 2009) ..............................................................................66

*In re World Health Atls., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) ...........................................................................41, 42

*Internal Revenue Serv. v. Kaplan (In re Kaplan)*,
104 F.3d 589 (3d Cir. 1997)..............................................................................................

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)..............................................................................................33

*Koelbl v. Glessing (In re Koelbl)*,
751 F.2d 137 (2d Cir. 1984)..............................................................................................48

*Master Mortgage Investment Funds, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994).........................................10, 17, 18, 19, 21, 26, 45

*Meyers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996.................................................................................30, 41, 42

*Millennium Labs*,
543 B.R. 703 (Bankr. D. Del. 2016) .................................................................................18

*Millennium Labs*,
591 B.R. 559 (D. Del. 2018)........................................................................................12, 18

*Nat'l Heritage Found., Inc. v. Highbourne Found., Inc.,*
   760 F. 3d 344 (4th Cir. 2014) ..................................................................................

*Nat'l Union Fire Ins., Co. of Pittsburgh, PA v. Boy Scouts of Am. (In re Boy Scouts of Am.),*
   650 B.R. 87 (D. Del. 2023) ........................................................................59, 61

*Newman v. Stein,*
   464 F.2d 689 (2d Cir. 1972) ...............................................................................41

*Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.),*
   913 F.2d 873 (11th Cir. 1990) ............................................................................33

*Opt-Out Lenders v. Millennium Lab Holding II, LLC (In re Millennium Lab Holdings II, LLC),*
   594 B.R. 559 D. Del. 2018) ................................................................................59

*Pacor In. v. Higgins,*
   743 F.2d 984 (3d Cir. 1984) ...............................................................................12

*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
   390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d (1968) ..................................................

*SGL Carbon Corp.,*
   200 F.3d 154 (3d Cir. 1999) ...............................................................................

*Things Remembered, Inc. v. Petrarca,*
   516 U.S. 124 (1995) ...........................................................................................12

*TMT Trailer Ferry Inc. Anderson,*
   390 U.S. 414 , 88 S. Ct. 157, 20 L. Ed.2d 1 (1968) ............................................70

*Travelers Cas. & Sur. Co. v. Future Claimants Representative,*
   No. Civ. A. 07-2785, 2008 WL 021088 (D.N.J. Mar. 25, 2008) .........................42

*U.S. Bank. Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion),*
   426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................30

*United States v. Energy Res. Co.,*
   495 U.S. 545 (1990) ...........................................................................................55

*Winstar Holdings, LLC v. Blackstone Grp. L.P.,*
   No. 07-CV-4634, 2007 WL 4323003 ................................................................12

## **Statutes**

11 U.S.C. §§ 101-1532 ...............................................................................................1

11 U.S.C. § 105 ................................................................................................................. 11

11 U.S.C. § 105(a) ...................................................................................................... 11, 17

11 U.S.C. § 328 ................................................................................................................. 50

11 U.S.C. § 330 ................................................................................................................. 50

11 U.S.C. § 331 ................................................................................................................. 50

11 U.S.C. § 363(b)(1) ....................................................................................................... 41

11 U.S.C. § 363(f) ............................................................................................................ 41

11 U.S.C. § 365 ................................................................................................................. 40

11 U.S.C. 503(b) ............................................................................................................... 50

11 U.S.C. § 507 ................................................................................................................. 57

11 U.S.C. § 507(a)(1) ....................................................................................................... 57

11 U.S.C. § 1114 ............................................................................................................... 57

11 U.S.C. § 1122 ........................................................................................................ 32, 36

11 U.S.C. § 1122(a) ................................................................................................... 32, 33

11 U.S.C. § 1123 ............................................................................................................... 32

11 U.S.C. § 1123(a) ................................................................................................... 35, 37

11 U.S.C. § 1123(a)(1) ..................................................................................................... 36

11 U.S.C. § 1123(a)(2) ..................................................................................................... 36

11 U.S.C. § 1123(a)(3) ..................................................................................................... 36

11 U.S.C. § 1123(a)(4) ............................................................................................... 36, 37

11 U.S.C. § 1123(a)(5) ............................................................................................... 37, 38

11 U.S.C. § 1123(a)(6) ..................................................................................................... 38

11 U.S.C. § 1123(a)(7) ............................................................................................... 38, 39

11 U.S.C. § 1123(a)(8) ................................................................................................................39

11 U.S.C. § 1123(b) ...............................................................................................................39, 40

11 U.S.C. § 1123(b)(1) ..........................................................................................................39, 40

11 U.S.C. § 1123(b)(2) ................................................................................................................40

11 U.S.C. § 1123(b)(3) ................................................................................................................40

11 U.S.C. § 1123(b)(3)(A) .....................................................................................................30, 41

11 U.S.C. § 1123(b)(6) ......................................................................................................11, 43, 44

11 U.S.C. § 1124 .........................................................................................................................39

11 U.S.C. § 1125 .........................................................................................................................46

11 U.S.C. § 1125(b) ...............................................................................................................46, 47

11 U.S.C. § 1126 ...........................................................................................................6, 46, 47, 48

11 U.S.C. § 1126(a) .....................................................................................................................47

11 U.S.C. § 1126(f) .............................................................................................................7, 47, 48

11 U.S.C. § 1126(g) .....................................................................................................................47

11 U.S.C. § 1129 ...............................................................................................1, 2, 7, 11, 32

11 U.S.C. § 1129(a) .................................................................................................................2, 32

11 U.S.C. § 1129(a)(1) ...........................................................................................................11, 32

11 U.S.C. § 1129(a)(2) ................................................................................................................46

11 U.S.C. § 1129(a)(3) ................................................................................................................50
48
11 U.S.C. § 1129(a)(4) ................................................................................................................50

11 U.S.C. § 1129(a)(5) ................................................................................................................51

11 U.S.C. § 1129(a)(6) ................................................................................................................52

11 U.S.C. § 1129(a)(7) ...........................................................................................................52, 53

11 U.S.C. § 1129(a)(7)(A) ..................................................................................52

11 U.S.C. § 1129(a)(8) ...............................................................7, 35, 47, 53, 54

11 U.S.C.  § 1129(a)(9) .................................................................................54

11 U.S.C. § 1129(a)(10) .................................................................................54

11 U.S.C. § 1129(a)(11) .............................................................................55, 56

11 U.S.C. § 1129(a)(12) .............................................................................56, 57

11 U.S.C. § 1129(a)(13) .................................................................................57

11 U.S.C. § 1129(a)(14) .................................................................................57

11 U.S.C. § 1129(a)(15) .................................................................................57

11 U.S.C. § 1129(a)(16) .............................................................................57, 58

11 U.S.C. § 1141 .........................................................................................63

11 U.S.C. § 1141(a) ...............................................................59, 64, 65, 66

11 U.S.C. § 1146(a) .....................................................................................38

28 U.S.C. § 157 .....................................................................................10, 11

28 U.S.C. § 157(a) .......................................................................................13

28 U.S.C. § 157(b) .......................................................................................16

28 U.S.C. § 157(b)(2)(L) .........................................................................11, 16

28 U.S.C. § 1334 .........................................................................................10

28 U.S.C. § 1334(a) .................................................................................11, 16

28 U.S.C. § 1334(b) .................................................................................11, 13

28 U.S.C. § 1930 .....................................................................................56, 57

**Rules**

Fed. R. Bankr. P. 9019 .............................................................................41, 70

## <u>Other Authorities</u>

1 Collier on Bankruptcy (16th ed. 2021) ...........................................................................11, 12, 16

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) ...........................................................32, 46

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ...................................................................46

Roosevelt Inn. LLC (the "*RI Debtor*") and Roosevelt Motor Inn Inc. (the "*RMI Debtor*" and together with the RI Debtor, the "*Debtors*"), the debtors and debtors in possession in the above-captioned chapter 11 cases, submit (a) this memorandum of law in support of confirmation of the Second Amended Joint Plan of Reorganization [D.I.487] (as amended, modified, or supplemented from time to time, the "*Plan*") pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "*Bankruptcy Code*"), and (b) this Omnibus Reply to the Plan Confirmation Objections filed by (i) Nationwide Mutual Insurance and Harleysville Preferred Insurance Company ("*Nationwide*") [D.I. 520], (ii) Samsung Fire & Marine Insurance co., Ltd. (U.S. Branch) ("*Samsung*") [D.I. 521], (iii) Great American Insurance Company of New York ("*GAIC*") [D.I. 524], (iv) American Guarantee & Liability Insurance Company ("*AGLIC*") by way of joinder to objections of Nationwide and Samsung [D.I. 522], (v) Public Service Mutual Insurance Company ("*PSMIC*") by way of joinder to objections of Nationwide and Samsung [D.I. 526], (vi) ACE Property & Casualty Insurance Company ("*ACE*") by way of joinder to objections of Nationwide and Samsung [D.I. 527], (vii) Praetorian Insurance Company ("*Praetorian*") by way of joinder to objections of Nationwide and Samsung [D.I. 528], and (viii) Philadelphia Indemnity Insurance Company ("*PIIC*") by way of joinder to objections of Nationwide and Samsung [D.I 529] (PIIC, together with Nationwide, Samsung, GAIC, AGLIC, PSMIC, ACE and Praetorian, collectively, the "*Insurance Companies*")[1]. In addition to the Harris and Uzzo Declarations[2], the Debtors also intend to submit additional declarations, and reserve the right to submit additional evidence as necessary at the confirmation hearing in further support of the Plan.

---

[1] Additionally, a Reservation of Rights of Certain Class 5 Tort Claimants with respect to Confirmation of the Debtors' Second Amended Plan of Reorganization was filed [D.I. 525] to which no response is required.

[2] The *Declaration of Anthony Uzzo, as it may be supplemented, In Support of Confirmation of Second Amended Joint Plan of Reorganization* (the "*Uzzo Declaration*"), as it may be supplemented, and *Declaration of Greg Harris, as it may be supplemented, In Support of Confirmation of Second Amended Joint Plan of Reorganization* (the "*Harris Declaration*") have been or shall be filed.

## PRELIMINARY STATEMENT

1.      These Chapter 11 Cases[3] have been pending for slightly over two years and can be characterized by a complexity of bankruptcy law issues presented, insurance coverage litigation in the District Court and Bankruptcy Court, and on-going good faith settlement and mediation attempts by and among the parties. Along the way, the Debtors have developed, negotiated, and filed multiple versions of the Plan.  Remarkably, but not surprisingly, based upon the time and effort devoted by all of the parties-in-interest and their respective professionals, the Debtors are now ready to confirm a chapter 11 plan that is (i) supported by the holders of Direct Tort Claims, (ii) supported by the holders of Interests, and (iii) not opposed by any creditor in any Voting Class, nor opposed by the Philadelphia Office of the United States Trustee for Region 3 (the "*U.S. Trustee*").  The only Plan objections (each addressed in the Omnibus Reply) are objections from the Insurance Companies who are not creditors or holders of claims in any Voting Class. Thanks to the significant efforts of the Debtors, the Released Parties and the Direct Tort Claimants, the parties were able to reach a settlement embodied in the Plan  that is both premised on significant contributions and concessions from the Released Parties in exchange for the Channeling Injunction and Third-Party Releases from the holders of Tort Claims, that: (a) will create a path to allow the Insurance Actions to be determined by a court of competent jurisdiction, (b) will allow the Tort Claims to be determined in accordance with the provisions of the Trust Distribution Procedures, (c) will provide for the confirmation of the Plan, and (d) which Plan will provide for payments in full to the Debtors' administrative, priority and secured creditors, for payments nearly in full to the Debtors' unsecured creditors, and the consensual treatment for holder of Interests.

---

[3] Capitalized terms used, but not defined herein, have the same meaning ascribed to them in the Plan.

2.      Following extensive negotiations and many concessions to achieve "insurance neutrality," the Insurance Companies filed eight related objections to confirmation of the Plan raising four objections.  As detailed below, based upon current Third Circuit cases addressing these four objections, the Debtors easily conclude that these arguments in opposition to confirmation shall be overruled and, in any event, are not Section 1129(a) issues that can, let along should, derail the confirmation of the Plan.

3.      If the Plan is not confirmed, then the creditors that are receiving a full or almost full recovery will be harmed and the Debtors will be unable to reorganize their affairs. The third-party release and injunction provisions are an essential component to the Plan and are critical to (a) the Equity Security Holders Contribution being made to the Reorganized Debtors' Estates, (b) the Settlement Trust Contribution being made to the Settlement Trust, and (c) the Plan payments being made to the holders of Allowed Classes 1, 2, and 3 Claims and the holders of unclassified Allowed Administrative Claims and Allowed Priority Claims, all of whom would otherwise receive significantly reduced payouts, if anything, because the contributions would evaporate. These full or near-full payments are available only because of contributions that the Released Parties are willing to make *on the condition that the Plan would provide the discharge, release, exculpation and injunction provisions set forth in the Plan in favor of the Debtors and other Released Parties*. For all of these reasons, the Plan presents the best go-forward option for the Debtors, their Estates and all creditors, and satisfies each of the requirements of section 1129 of the Bankruptcy Code, and therefore, should be confirmed.

## BACKGROUND

4.      On June 16, 2021 (the "***Petition Date***"), the Debtors filed these chapter 11 cases (the "***Chapter 11 Cases***") to address the claims asserted in the five Pre-Petition Lawsuits that

3

alleged statutory and common law negligence claims associated with sex trafficking of minors and the insurance coverage disputes which followed.  The claims asserted in the Pre-Petition Lawsuits and the ten additional tort claims filed in the Chapter 11 Cases are collectively referred to as the direct tort claims (the "***Direct Tort Claims***").  The Pre-Petition Lawsuits generally allege that traffickers would bring minors to the Roosevelt Inn for the purpose of commercial sex work.[4] An overview of the facts relevant to the Debtors' business, the circumstances precipitating the chapter 11 filings, the insurance coverage litigation that continues to loom large in these Chapter 11 Cases, can be found in the First Day Declaration,[5] and the Third Amended Disclosure Statement to the Second Amended Joint Plan of Reorganization (the "***Disclosure Statement***"),[6]The facts therein are incorporated by reference herein. The primary goal of these proceedings has always been to, among other things, (a) equitably compensate holders of Direct Tort Claims, as well as holders of Indirect Tort Related Claims (together with Direct Tort Claims, the "***Tort Claims***"), (b) determine the amount and extent of insurance coverage available, if any, to the Debtors to fund payments to holders of Tort Claims, (c) allow the insurance coverage disputes to be determined by a court of competent jurisdiction, (d) allow for the determination of the Tort Claims in accordance with the provisions of the TDP, and (e) reorganize the affairs of the Debtors, so that they emerge from bankruptcy with the capability to continue to operate their hotel.  All of these objectives will be accomplished under the Plan.

     5.     The Debtors have engaged with the holders of Direct Tort Claims, the Equity Security Holders, the Insurance Companies and the the U.S. Trustee over the course of this case

---

[4] *See Declaration of Anthony Uzzo in Support of Chapter 11 Petitions and First Day Motions ("First Day Declaration") [D.I. 11] at* Decl. ¶ 13.

[5] D.I.11.

[6] D.I.488.

in an effort to reach a comprehensive settlement that would create a mechanism by which the universe of Tort Claims shall be (a) *permanently channeled* to the Settlement Trust and administered in accordance with the Trust Distribution Procedures *in full satisfaction and release* of any and all such Tort Claims against the Released Parties, and (b) *permanently enjoined and released* against the Released Parties pursuant to the Injunctions and Releases set forth in the Plan and the Plan Support Agreement.   On May 9, 2023, the Debtors entered into a plan support agreement (as may be amended, supplemented, or otherwise revised from time to time, the "*Plan Support Agreement*") with UFVS Management Company, LLC ("*UFVS*"), Yagna Patel ("*Patel*"), the Joseph Cion Irrevocable Trust of 1993 (the "*Cion Trust*") and the Trust A U/W/O of Henriette Jacobson (the "*Jacobson Trust*" and together with the Cion Trust the "*Equity Security Holders*"), and holders of Direct Tort Claims A.H., B.H., C.A., K.R., M.B., B.S., D.P., D.W., E.B., J.H., L.E., S.M., S.W., T.H., and T.S. (collectively, the "*Direct Tort Claimants*") that details the settlement reached among these parties and provides <u>inter alia</u> that:

> a cash payment of $1,587,500.00 to the Settlement Trust funded by: (i) the Equity Security Holders Contribution in the amount of One Million One Hundred Thousand Dollars ($1,100,000.00) on the Effective Date of the Plan, (ii) the UFVS Contribution in the amount of Thirty Thousand Dollars ($30,000.00) on the Effective Date of the Plan, (iii) the Patel Contribution in the amount of Ten Thousand Dollars ($10,000.00) on the Effective Date of the Plan, and (iv) the balance of Four Hundred and Forty-Seven Thousand Five Hundred 00/100 Dollars ($447,500.00) from the proceeds of the Exit Financing provided by the Exit Financing Lender on the Effective Date of the Plan.  As set forth in the Plan, the Exit Financing shall *inter alia* be in an amount no less than $2,100,000, secured by a first mortgage lien in all of the assets of the Reorganized Debtors and shall be utilized by the Reorganized Debtors to make the payments due on the Effective Date of the Plan.  The Settlement Amount being funded by the Debtors, Reorganized Debtors, the Equity Security Holders, UFVS, and Patel is in consideration for the treatment, protections, injunctions, and releases provided to such persons all of whom are Released Parties.

6.      The Plan Support Agreement memorialized months of additional negotiations among the Debtors, Released Parties and Direct Tort Claimants and was the basis for the Debtors filing the Plan on May 10, 2023.  In addition, the Equity Security Holders are facilitating the procurement of the Exit Financing from the Exit Lender, a related party to facilitate the funding of the Plan as required by the Plan Support Agreement.

7.      On June 15, 2023, the Court entered the Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (the "***Disclosure Statement Order***" and at times, also referred to, as the "***Solicitation Procedures Order***").[7] The Debtors commenced solicitation of holders of Claims in Class 3 (General Unsecured Claims), Class 5 (Direct Tort Claims), and Class 6 (Indirect Tort Related Claims) (together, the "***Voting Classes***").[8] The Court established August 1, 2023, at 4:00 p.m. (prevailing Eastern Time) as the deadline for holders of Claims to return their ballots to accept or reject the Plan (the "***Voting Deadline***").

8.      The voting results show that in both the RI and RMI Chapter 11 Cases: (a) RI and RMI Holders of Claims in Class 3 (General Unsecured Claims) and Class 5 (Direct Tort Claims), which are Impaired and entitled to vote on the Plan, have voted to accept the Plan in both the numbers and amounts required by section 1126 of the Bankruptcy Code; (b) no Ballots were

---

[7] D.I.476.

[8] Under the Plan, Class 4 (Non-Tort Litigation Claims) is also an impaired class entitled to vote. However, as of the Voting Record Date (as defined in the Solicitation Procedures Order), no holders of Non-Tort Litigation Claims existed, and Class 4 was a vacant class. Pursuant to the Solicitation Procedures Order, the Debtors did not solicit this vacant class. *See* Plan, Art.II.B.9 [D.I.487].

submitted in RI or RMI Class 6 (Indirect Tort Related Claims) and as provided pursuant to Article V.C.16 of the Solicitation Procedures, if no ballot is submitted in a Class, then such Class shall be deemed to have voted to accept the Plan, and (c) there is no holder of a Class 4 Claim that is Allowed and therefore, Class 4 is considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class[9]. RI and RMI Class 1 (Secured Claims), RI and RMI Class 2 Priority Claims, Class 7 (Interests in RI) and Class 8 (Interests in RMI), each of which is unimpaired, are deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.  Accordingly, all Classes of Claims and Interests in both the RI and RMI Chapter 11 Cases have either voted to, or deemed to, have accepted the Plan.

## **ARGUMENT**

9.      A chapter 11 plan can be confirmed if it satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence. The Debtors have satisfied this burden under section 1129, as demonstrated herein and at the confirmation hearing. This memorandum is divided into three parts: the first addresses the fairness, necessity and enforceability of the Third-Party Releases and Channeling Injunction, the second addresses the Plan's compliance with the applicable requirements under section 1129 of the Bankruptcy Code, and the third is the Debtors' Omnibus Reply to the Plan Confirmation Objections filed by the Insurance Companies.

---

[9] Pursuant to Article IV.F of the Disclosure Statement and Article II.9 of the Plan, Class 4 is considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

**I.      The Third-Party Releases and Channeling Injunction have been Consented to and Should Be Approved**

10.      As part of the overall compromise and settlement of disputed issues under the Plan that results in the Settlement set forth in Article V.B of the Plan, the Plan provides for (i) certain releases contained in Article X.J.1.a and X.J.1.b of the Plan granted by the Debtors and their Estates in favor of the Released Parties (the "***Debtors' Releases***"), (ii) certain releases contained in Article X.J.2 of the Plan by the holders of Tort Claims in favor of the Released Parties (the "***Third-Party Releases***") and (iii) the channeling injunction contained  Article X.F of the Plan to permanently channel all Tort Claims against the Released Parties to the Settlement Trust which shall administer these Tort Claims in accordance with the Trust Distribution Procedures (the "***Channeling Injunction***").  The Plan also contains additional injunctions, including, a Discharge Injunction (Article X.E.2), an Insurance Entity Injunction (Article X.H), the Injuction Related to Releases, (Article X.L.1), the Injunction Related to Exculpation (Article X.L.2), and the Injunction Related to Plan Interference (Article X.I).  The Direct Tort Claimants (Class 5) in the Chapter 11 Cases have agreed to the Debtors' Releases, Third-Party Releases and the Injunctions set forth in the Plan.  Likewise, Class 6 (Indirect Tort Related Claims) is deemed to have accepted the Plan and have not objected to the Plan.

11.      The Third-Party Releases and Channeling Injunction are mission critical to the tapestry of settlements and concessions interwoven throughout the Plan and pending before this Court. These provisions work hand-in-glove to transfer all Tort Claims to the Settlement Trust, and holders of such claims will be entitled to receive payment from the Settlement Trust in accordance with the distribution priorities in the Plan and the Trust Distribution Procedures. Absent the global resolution embodied in the Settlement, such holders of Tort Claims would receive significantly less or nothing (based on the Debtors' Liquidation Analysis (as defined

herein)).[10]  The Third-Party Releases, and the Debtors' Releases are necessary and appropriate in light of the specific facts and circumstances surrounding these Chapter 11 Cases and the contributions by the Released Parties and each of their respective related parties that make the Plan and the recoveries contemplated thereunder possible. ***The contributions of the Released Parties, directly or indirectly, to the Settlement are expressly conditioned upon entry of the Confirmation Order approving the Third-Party Releases, the Channeling Injunction and the Plan Support Agreement, and confirming the Plan and the occurrence of the Effective Date.***

12.     Likewise, the Holders of Tort Claims are the main constituency at issue when it comes to considering whether the Third-Party Releases and Channeling Injunction should be approved. Importantly, none of the other parties subject to the release provisions has filed an objection to the Plan. Indeed, all of the holders of Class 5 Direct Tort claims are signatories to the Plan Support Agreement with the Debtors, each of whom expressly support the release and injunction provisions and otherwise provide their support for the Plan.[11] Accordingly, there is overwhelming support for the Plan, including the Releases and Injunctions therein, and no party has objected to this treatment under the Plan, presumably given the substantial recoveries that they are receiving.

13.     Even without the such support for the Third-Party Releases and the Channeling Injunction from the affected parties, the Debtors can demonstrate that the law, as well as the evidence, support this Court's approval of these provisions even without the express consent of the affected parties. This Court has (a) subject-matter jurisdiction, (b) constitutional and statutory

---

[10] Harris Decl. ¶¶15; Disclosure Statement, Ex. A.

[11] *See* Plan Support Agreement, Plan, Ex.C.

authority, and (c) an evidentiary basis to find that *Continental* and *Master Mortgage* have been satisfied. Each of these criteria is addressed in turn below.

**A.      This Court Has Subject-Matter Jurisdiction to Confirm a Plan that Contains the Third-Party Releases and Channeling Injunction**

14.      Under sections 157 and 1334 of title 28 of the United States Code, this Court has subject-matter jurisdiction over three types of proceedings: (a) "proceedings arising under title 11," (b) "proceedings arising in a case under title 11," and (c) "proceedings related to a case under title 11."[12] All three bases of subject-matter jurisdiction apply here.

15.      Confirmation of a plan that contains third-party releases plainly falls within this Court's "arising under," "arising in" jurisdiction, and "related to" jurisdiction.[13] Here, the Debtors seek to confirm a Plan under which the Third-Party Releases and Channeling Injunction are integral to the recoveries contemplated therein. These provisions exemplify the significant overlap and interrelationship between the Debtors, the claims against them, and their property rights on the one hand, and the claims against and property interests of the beneficiaries of the Third-Party Release and Channeling Injunction on the other hand. Moreover, the released claims against the non-Debtors fall squarely within this Court's "related to" jurisdiction, as the claims being released plainly affect the assets of the Estates. Thus, this Court has subject-matter jurisdiction to confirm the Plan that includes the Third-Party Releases and Channeling Injunction.

16.      No creditor has objected to the Third-Party Releases and Channeling Injunction on jurisdictional grounds. Nevertheless, each of these grounds is addressed in turn.

---

[12] *See In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (stating that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.").

[13] *See Millennium Lab II*, 562 B.R. at 621.

### 1.   "Arising Under" Jurisdiction

17.   This Court has subject-matter jurisdiction to confirm a Plan that releases and enjoins third-party released claims because it has subject-matter jurisdiction over any matter "arising under" this "case" or "proceeding."[14] Here, the cases are under chapter 11, and the proceeding is confirmation of a plan of reorganization. Confirmation of a plan is a "core" proceeding in a chapter 11 case filed under the Bankruptcy Code.[15] Whether a chapter 11 plan can be confirmed is a legal question that arises under section 1129 of the Bankruptcy Code; and whether a release or channeling injunction therein should be approved is a determination made under sections 1129(a)(1), 1123(b)(6), and 105 of the Bankruptcy Code.[16] Thus, this Court has "arising under" jurisdiction to confirm the Plan with these provisions.

### 2.   "Arising In" Jurisdiction

18.   This Court also has "arising in" jurisdiction to confirm a plan providing for a third-party release and channeling injunction for the same reason this Court has "arising under" jurisdiction.[17] Confirmation of a plan arises in bankruptcy cases, and the proposed Third-Party

---

[14] 28 U.S.C. § 1334(a) (stating that "the district courts shall have original and exclusive jurisdiction of all cases under title 11"); 28 U.S.C. § 1334(b) (stating "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"); 28 U.S.C. § 157 ("Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.").

[15] 28 U.S.C. § 157(b)(2)(L); *see also* 1 Collier on Bankruptcy ¶ 3.02 (16th ed. 2021) (stating that "[t]here has never been any doubt about the constitutional authority of a nontenured judge to enter final orders" in matters of administration, including confirmation of plan).

[16] 11 U.S.C. § 1129(a)(1) (stating that a court can confirm a "plan [that] complies with applicable provisions of [the Bankruptcy Code]"); 11 U.S.C. § 1123(b)(6) (stating that "a plan may . . . include any other appropriate provision not inconsistent with the [Bankruptcy Code]."); 11 U.S.C. § 105(a)( "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out provisions of [the Bankruptcy Code].").

[17] *See In re Millennium Lab Holdings II, LLC,* 575 B.R. 252, 261 (Bankr. D. Del. 2017), *aff'd,* 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC,* 945 F.3d 126 (3d Cir. 2019) (holding that confirmation of a plan that contains third-party releases is a proceeding "arising in and arising under title 11" and thus a core proceeding that the Court has jurisdiction over); *In re Freedom Rings, LLC,* No. 05-14268 (CSS) (Bankr. D. Del. May 9, 2006) [D.I. 385] ("[T]here is a jurisdictional nexus between the proposed release to non-Debtor third parties and the Debtor. The entire Plan hinges on the releases, and the evidence is uncontroverted that without the releases, there

Releases and Channeling Injunction arise in and are an essential part of the Plan. Here, the Third-Party Releases and Channeling Injunction that have been incorporated in the Plan are essential to the Debtors' reorganization effort. Without such releases and injunction, the Plan would not be possible.[18] Further, such provisions are narrowly tailored only to impact Tort Claims, which are claims related to the alleged statutory and common law negligence claims associated with the sex trafficking of minors and were the impetus for the Debtors commencing these chapter 11 cases. The Tort Claims must be fully and finally resolved to allow the Debtors to reorganize successfully, which can only be accomplished through the comprehensive solution in the Plan.[19]Thus, this Court also has "arising under" jurisdiction to confirm the Plan with these provisions.

### 3.    "Related to" Jurisdiction

19.    The Court has "related to" jurisdiction" over all of the Tort Claims being channeled or released pursuant to the Plan. An action is "related to" a bankruptcy case where "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy," meaning that "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."[20] "The test is ***conceivable*** impact on the estate; this

---

is little prospect of confirming a Plan."); 1 Collier on Bankruptcy P 3.01 (16th 2021) (explaining that matters "arising under" title 11 include "confirmation of a plan under chapters 9, 11, 12 or 13").

[18] Uzzo Decl. ¶16.

[19] *Millennium Lab,* 945 F.3d at 137 (holding that the bankruptcy court has constitutional authority to confirm a plan granting third-party releases when such releases are "integral to the restructuring of the debtor-creditor relationship.").

[20] *Pacor Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original). Although the Supreme Court has overruled certain aspects of the *Pacor* decision in *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995), the analysis of "related to" jurisdiction in *Pacor* remains controlling law that the Third Circuit continues to cite favorably. *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 164 n.6 (3d Cir. 2004). The Supreme Court agreed with the *Pacor* court's analysis of the scope of "related to" jurisdiction in *Celotex*. 514 U.S. 300. *See also Combustion Eng'g*, 391 F.3d at 226. The "key word . . . is 'conceivable.' Certainty, or even likelihood, [of an effect on the estate] is not required." *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07-CV-4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007) (quoting *In re Dow Corning Corp.*, 86 F.3d 482, 491 (6th Cir. 1996)).

Court does "not have to determine an absolute certainty that an underlying lawsuit will impact the estate."[21] In other words, "[t]he 'related to' language of [section] 1334(b) must be read to give district courts (and bankruptcy courts under [section] 157(a)) jurisdiction over more than simply proceedings involving the property of the debtor or the estate."[22] Here, the Tort Claims subject to the Third-Party Releases and Channeling Injunction would undoubtedly have a direct and "conceivable" effect on the Debtors' estates and the restructuring for two reasons: (a) there is an identity of interests between the Debtors and the Released Parties and (b) claims against the Released Parties directly diminish property of the estates.

**(a)     The Released Parties Share an Identity of Interest with the Debtors**

20.     An identity of interest exists between the Released Parties in light of their interconnectedness to the Debtors.[23] The Debtors own and operate the Roosevelt Inn, a two-story hotel with 105 rooms available for rent, located in a predominately working-class neighborhood on Roosevelt Boulevard. The Debtors have no other business purpose, and all of their dealings with the non-Debtor Released Parties were in pursuit of their hotel business.[24] Each of the Released Parties were all independently working towards a common purpose or goal—operating the Roosevelt Inn—which is the sole basis for their business relationship with the Debtors. The Released Parties were involved with either the ownership or operations of the hotel and/or, should

---

[21] *In re Boy Scouts of Am. et al.*, 642 B.R. 504, 592 (Bankr. D. Del. 2022).

[22] *Celotex*, 514 U.S. at 308 (quoting *Pacor*, 743 F.2d at 994).

[23] *Accord Boy Scouts*, 642 B.R. at 590 (describing the "interconnectedness" between the debtors and the parties benefiting from the nonconsensual release and the debtors' charitable purpose).

[24] First Day Decl. ¶10.

there be a Settling Insurance Company, said Settling Insurance Company would have been involved in insuring the hotel.

21.     Since 1999, the RI Debtor has had two members, who own equal interests in the RI Debtor, the Cion Trust and the Jacobson Trust (together, the "*Equity Security Holders*").  Each trust has its own trustee: Anthony Uzzo for the Jacobson Trust, and Blanch Bersch, Esquire, for the Cion Trust, respectively.  Ms. Bersch is Mr. Cion's daughter.[25]

22.     The Roosevelt Inn employs several individuals and representatives, including its hotel general manager, Patel, who has held the position of general manager in excess of 30 years. Patel oversees a staff of 15 to 19 full and part-time employees who assist in the operation and upkeep of the hotel.[26]  Patel was named as a defendant in two of the Pre-Petition Lawsuits filed by M.B. and A.H.[27]  Patel is afforded insurance coverage under the Debtors' Insurance Policies.

23.     The Roosevelt Inn also retains UFVS to provide specific management services relating to the upkeep of the Roosevelt Inn's major infrastructure and systems.  UFVS is a named insured under the Debtors' Insurance Policies.  UFVS was named as a defendant in all five of the Pre-Petition Lawsuits.[28]  Mr. Uzzo is the managing member of UFVS.[29]

24.     Therefore, the nature and extent of the relationship between the Released Parties and the Debtors are inextricably intertwined with the Roosevelt Inn, thus establishing an identity of interest.

---

[25] First Day Decl. ¶¶ 8-9; Disclosure Statement at Art.II.A.

[26] First Day Decl. ¶-8; Disclosure Statement at Art.II.A.

[27] Disclosure Statement at Art.III.B.

[28] Disclosure Statement at Art.III.B.

[29] Uzzo Decl. ¶ 1; Disclosure Statement at Art. II.A

**(b)    Released Tort Claims Against the Released Parties Could Result in Indemnification or Contribution Liabilities Against the Debtors**

25.    The scope of the released Tort Claims relates to the Debtors and their hotel. The Equity Security Holders wholly own the Debtors who employ UFVS to provide specific management services relating to the upkeep of the hotel's major infrastructure and systems, and is a named insured under the Debtors' Insurance Policies.  The RI Debtor also employs Patel as the hotel's general manager.  Patel has held the manager position in excess of 30 years and, as mentioned above, was named as a defendant in a number of the Pre-Petition Lawsuits commenced by the holders of Direct Tort Claims. Patel may have rights to common law indemnities and rights of contribution against the Debtors for any liability (and any defense costs) associated with the Tort Claims to be released by the Third-Party Releases.

26.    The other Released Parties that stand to benefit from the Third-Party Releases, are (a) UFVS which is a named insured under the Debtors' Insurance Policies and (b) the Equity Security Holders who own all the Interests in the Debtors. No Equity Security Holder is named as a defendant in the Pre-Petition Lawsuits and there is no known basis for them to be named as a defendant in any action filed by a Direct Tort Claimant.

27.    Although the Debtors dispute whether they or any related defendant would be found liable for negligence thereunder, the conceivability of the liability against the Debtors, their estates and the Released Parties is enough to establish an identity of interest. Consequently, any released Tort Claims that are asserted against a Released Party could have a direct impact on the Debtors and Estate assets, thus supporting a finding that related-to jurisdiction over the released Tort Claims exists. No party has argued otherwise.

**B.** **This Court Has Both Constitutional Authority and Statutory Authority to Enter a Confirmation Order Approving the Third-Party Releases and Channeling Injunction in the Plan**

28.     The law of the Third Circuit is clear: bankruptcy courts have both "***constitutional*** and ***statutory***" authority to approve plans with nonconsensual third-party releases and injunctions.[30] Bankruptcy judges can enter final orders in core proceedings, subject to a right to appeal to the district court.[31] "Confirmations of plans" is one of sixteen core proceedings enumerated under section 157(b) of title 28 of the U.S. Code.[32] "[E]ven in cases where a bankruptcy court exercises its 'core' statutory authority, it may be necessary to consider whether that exercise of authority comports with the Constitution."[33] This determination requires "a bankruptcy court . . . [to] look to the content of the plan and determine whether the matter is integral to the debtor-creditor relationship."[34]

29.     No party has objected to this Court's constitutional authority to confirm the Plan with the Third-Party Releases and the Channeling Injunction. Holders of Direct Tort Claims have agreed to these provisions and Indirect Tort Related Claims are deemed to have accepted these

---

[30] *See Boy Scouts*, 642 B.R. at 588 ("The Third Circuit has also ruled that a bankruptcy court has both statutory and constitutional authority to enter a final order confirming a plan containing nonconsensual third-party releases and injunctions if these provisions are "integral to the debtor-creditor relationship."); *Millennium Lab Holdings II,* 945 F.3d at 135, 137 (finding that the Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan" containing nonconsensual third-party releases and considering whether "that exercise of authority comports with the Constitution" by determining whether the matter is "integral to the debtor-creditor relationship"); *Mallinckrodt*, Case 20-12522-JTD, 30 n.69 ("I am applying the law of the Third Circuit which has recognized that bankruptcy courts do have statutory and constitutional authority to approve a plan of reorganization that contains non-consensual third-party release, *albeit,* only in extraordinary cases.").

[31] *See* 28 U.S.C. § 1334(a) (granting district courts with original and exclusive jurisdiction in all bankruptcy cases); *Amended Standing Order of Reference* (E.D. PA November 8, 1990) (referring all bankruptcy cases and their attendant civil proceedings to bankruptcy judges).

[32] 28 U.S.C. § 157(b)(2)(L); *see also* 1 Collier on Bankruptcy ¶ 3.02 (16th ed. 2021) (stating that "[t]here has never been any doubt about the constitutional authority of a nontenured judge to enter final orders" in matters of administration, including confirmation of plan).

[33] *In re Mallinckrodt PLC*, at 27 [D.I. 6347] (quoting *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137).

[34] *See id.*

provisions. Nevertheless, the Releases and Injunctions are integral to the debtor-creditor relationship in that the claims against the Debtors or the Released Parties cannot be decided in a vacuum. If the Released Parties were found liable to tort claimants that are subject to the release and injunction provisions, then the Released Parties could attempt to recover any amounts paid from the Debtors based on indemnification, reimbursement and/or otherwise for such liability. As of the Petition Date, the Debtors' Insurance Companies incurred in excess of a million dollars in defense fees and costs defending the Debtors and defendants Patel and UFVS with respect to the Pre-Petition Lawsuits.   Such litigation would only be exacerbated if holders of Tort Claims sought to pursue the Released Parties for the Tort Claims. The Debtors cannot piecemeal their resolution of the Tort Claims without risking expensive and protracted litigation. The Plan, and global resolution therein, is necessary for finality and to obtain the funding from the Released Parties necessary to make the Plan possible. The Released Parties will provide such consideration only on the condition that they receive the benefit of the Third-Party Releases and Channeling Injunction, which only affects holders of Tort Claims.

   **C.**     **The Third-Party Releases and Channeling Injunction Are Appropriate Under the Unique and Extraordinary Circumstances of this Case**

   30.     Under Third Circuit precedent, the Court should approve third-party releases and related channeling injunction when (a) the third-party release and/or channeling injunction satisfy the hallmarks of fairness and necessity to the chapter 11 plan and are given in exchange for fair consideration[35] and (b) there are exceptional circumstances warranting such relief.[36]

---

[35] 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Continental*, 203 F.3d at 214 ((holding that a third-party injunction would only be proper under section 105(a) of the Bankruptcy Code if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair).

[36] *Continental,* 203 F.3d at 217 (citing *Master Mortgage Investment Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Millennium Lab Holdings II*, 945 F.3d at 139.

31.     While this Court need go no further in approving the Third-Party Releases and the Channeling Injunction than to apply the "fair and necessary" standard articulated in *Continental* and subsequent Third Circuit authority, courts in this circuit have often considered the *Master Mortgage* factors as "helpful guideposts" to determine whether the "fairness and necessary" *Continental* standard has been met.[37] This standard has been more than satisfied here. Courts in the Third Circuit have considered the following non-exclusive and disjunctive *Master Mortgage* factors in determining whether the fair and necessary standard has been met.[38]

(a)     whether there is an identity of interest between the debtor and the third party such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

(b)     whether the non-debtor made a substantial contribution of assets to the reorganization;

(c)     the essential nature of the injunction to the reorganization to the extent that there is little likelihood of success without the injunction;

(d)     whether a substantial majority of creditors agree to such injunction, specifically if the impacted class or classes "overwhelmingly" voted to accept the plan; and

(e)     whether the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[39]

---

[37] It is most common for bankruptcy courts to apply the *Master Mortgage* factors when considering approval approve of a debtor's release of third parties. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) (citing *Master Mortgage*); *In re Spansion*, 426 B.R. 114, 142-43 (Bankr. D. Del. 2010) (same). In *Millennium Labs*, this Court applied *Master Mortgage* to determine whether third-party releases should be approved in a plan. *Millennium Labs*, 575 B.R. at 272 ("The *Master Mortgage* factors, like the *Dow* factors (or any other standard in circuits that permit third-party releases), are a federal, judicially-created yardstick against which a [third-party] release is measured."); *see also Millennium Labs*, 591 B.R. 559, 584 (D. Del. 2018) (referring the *Master Mortgage* factors as "helpful guideposts"); *Millennium Lab*, 543 B.R. 703, 711 (Bankr. D. Del. 2016) ("In making that determination, I considered the factors articulated in *In re Master Mortgage*. . .but ultimately returned to the *Continental* hallmarks.").

[38] *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) (citing *Master Mortgage*); *Spansion*, 426 B.R. at 142-43 (same).

[39] *Tribune Co.*, 464 B.R. at 186 (stating that "these factors are neither exclusive nor conjunctive requirements" and they simply provide guidance in this Court's determination of fairness).

18

32.    The evidence in these Chapter 11 Cases demonstrate that the Third-Party Releases and the Channeling Injunction satisfy the fair and necessary hallmarks under *Continental*, as guided by the *Master Mortgage* factors, and thus, should be approved.

### 1.    Identity of Interest

33.    Courts in this circuit have found that there is an identity of interest between a debtor and non-debtor on various grounds, including when (a) the debtors are obligated to indemnify, reimburse, or otherwise advance funds pursuant to a contractual arrangement with the non-debtor party or (b) the debtor and non-debtor share a common goal of confirming the Plan and implementing a settlement of complex multi-party litigation.[40] Here, the indemnification, contribution, and reimbursement obligations between the Released Parties that are discussed above in section I.A.3. of this memorandum are applicable to this factor under *Master Mortgage*. These obligations make clear that a claim against the Released Parties that is being released is, or can be, a claim against the Debtors. In addition, the Released Parties share a common goal of restructuring the Debtors and facilitating the global resolution of the Direct Tort Claims and the insurance coverage disputes. *The contributions of the Released Parties, directly or indirectly, to the Settlement are expressly conditioned upon entry of the Confirmation Order approving the Plan, the Third-Party Releases, the Channeling Injunction and the Plan Support Agreement, and the occurrence of the Effective Date.* The Equity Security Holders, Patel and UFVS, among others, have entered into the Plan Support Agreement that require each party to support the Plan. Failure

---

[40] *See Blitz U.S.A.*, 2014 WL 2582976, at *6 (finding an identity of interest between the debtor and several other parties due to, among other things, indemnification obligations and shared insurance proceeds); *Tribune*, 464 B.R. at 187 (finding that debtors and releasees "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the *Master Mortgage* factors).

to adhere to this requirement could put confirmation of the Plan at risk, resulting in a termination event under the Plan Support Agreement.

34.    Importantly, the Released Parties have a common goal of avoiding complex, multi-party litigation related to the Tort Claims. Such litigation has proven to be costly, unsustainable and has the potential to significantly reduce or eliminate any meaningful recovery to all creditors. Such litigation would be lengthy, expensive, and time consuming, which would be to the detriment of the holders of Tort Claims and all other creditors that are benefiting from the Settlement under the Plan. The Released Parties recognize that the Third-Party Releases and Channeling Injunction avoids such risk, allows value to be provided to the Settlement Trust, allows for the determination of the Tort Claims in accordance with the provisions of the TDP, and offers certainty and finality to all holders of Direct Tort Claims, and the Released Parties. Therefore, there is an identity of interest between the Debtors and the Released Parties.

### 2.    Substantial Contributions

35.    "It is within the bankruptcy court's discretion to determine whether the nature and size of the consideration rises to the level of a 'substantial' contribution."[41] A bankruptcy court will consider the value of the contributions to the specific estate when determining whether the consideration provided constitutes a substantial contribution.[42] Courts in the Third Circuit have found that non-debtors have made substantial contributions to a Plan when they have contributed,

---

[41] *In re rue21, Inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) (finding a substantial contribution where there was valuable and material contribution to the estate though the success of the plan of reorganization was not contingent on the release at issue).

[42] *In re Washington Mutual Inc.*, 42 B.R. 314, 348 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486 B.R. at 304 (finding substantial contribution from senior management and holders of equity and debt instruments of the debtors where post-petition services were performed for the debtors without compensation).

among other things, cash, capital to cover operating shortfalls after a plan's effective date, rights assigned to a trust, and/or released claims against the debtor.[43]

### (a)    The Debtors

36.    The Reorganized Debtors will contribute to the Settlement Trust (a) cash in the amount of $1,587,500; (b) the Insurance Assignment, and (c) the Settlement Trust Causes of Action (the "***Settlement Trust Contribution***").    Thereafter, the Settlement Trust shall fund distributions on account of, and satisfy, compensable Tort Claims in accordance with the Trust Distribution Procedures from the Settlement Trust Assets.    Additionally, the Reorganized Debtors will procure Exit Financing from the Exit Lender in an amount no less than $2,100,000.00, to pay the balance of $447,500.00 on account of the Settlement Amount and to pay the Reorganized Debtors' other obligations due under the Plan, including its obligations to fund the Professional Fee Reserve, the GUC Fund, and to make the other Distributions on account of the Allowed Class 1 through 3 Claims.[44] These contributions are material and necessary to provide holders of Claims in Classes 1 through 3 with payment in full or substantial payment in full, and facilitates the best opportunity for a meaningful recovery by the holders of Direct Tort claims and Indirect Tort Related Claims in in Class 5 and 6 as discussed below in section I.C.5. of this memorandum. The significance of these distributions is apparent in the liquidation analysis attached to the Disclosure Statement as Exhibit A (the "***Liquidation Analysis***") which provides that in a Chapter 7

---

[43] *Millennium Lab*, 575 B.R. at 261 (finding that certain non-debtor parties' $325 million contribution in exchange for third-party releases constituted substantial contribution in satisfaction of the *Master Mortgage* factors); *Am. Family Enters*., 256 B.R. at 406-08 (finding that a third party's contribution of more than $70 million to fund, in part, consumer fraud victim's fund, was a substantial contribution supporting protection under channeling injunction); *Blitz U.S.A.*, Case No. 11-13603 (PJW) (approving third party nonconsensual release and channeling injunction for protected parties, including, among others, (a) Walmart, which contributed more than $24 million to the personal injury trust and waived various claims and (b) certain insurers, who contributed more than $137 million to the personal injury trust).

[44] As previously noted, Class 4 is considered vacant and deemed eliminated from the Plan.

liquidation, there is an inability pay Chapter 11 Administrative Expense Claims in full, let alone pay any Priority Claims and/or General Unsecured Claims, following the payment of Secured Claims. In contrast, supported by the substantial contributions of the Reorganized Debtors (which is funded by the substantial contributions of the Released Parties as discussed below), Class 1 Secured Claims are paid 100%, Class 2 Non-Tax Priority Claims are paid 100% and Class 3 are paid approximately 95% under the Plan and the Settlement Trust receives the Settlement Trust Contribution which includes a cash payment of $1,587,500. As noted above, the Tort Claims will be determined in accordance with the provisions of the Trust Distribution Procedures and will benefit from the Settlement Trust Contribution. Class 4 is considered vacant and deemed eliminated from the Plan.

### (b)    Equity Security Holders

37.    Equity Security Holders will make a cash contribution of $1,100,000 to the Reorganized Debtors on behalf of themselves (and other Debtor Related Parties) in consideration of the Channeling Injunction and Third-Party Releases being provided under the Plan.[45] The Equity Security Holders will also facilitate the procurement of the Exit Financing in the amount of $2,100,000 to from the Exit Lender to also fund the Plan.

### (c)    UFVS

38.    UFVS will make a cash contribution of $30,000 to the Reorganized Debtors in consideration of the Channeling Injunction and Third-Party Releases being provided under the Plan. Therefore, UFVS has made a substantial contribution.[46]

---

[45] Uzzo Decl. ¶26; Harris Decl. ¶16; Disclosure Statement at Art. I.A..

[46] *Id.*

### (d)    Patel

39.    Patel will make a cash contribution of $10,000 to the Reorganized Debtors in consideration of the Channeling Injunction and Third-Party Releases being provided under the Plan.[47]

40.    "Substantial contribution" under *Master Mortgage* is intended to assess the fairness of a nonconsensual third-party release and does not require every protected party to make a direct financial contribution.[48] Courts in the Third Circuit consider whether adequate consideration has been provided in exchange for the release when assessing whether the substantial contribution factor has been met. Although a direct financial contribution may evidence such consideration,[49] such a financial contribution is not necessary to satisfy the Third Circuit's standards for nonconsensual third-party releases.[50]

41.    Here, there are direct contributions from *all* of the Release Parties.  That said, the Equity Security Holders' substantial contributions alone justify the release of the other Debtor Related Parties under Third Circuit law

42.    The Court in *Mallinckrodt* explained that releasing non-debtors who did not contribute directly was "fair" under *Continental* where the debtor "provided additional compensation in exchange for the releases of these non-debtors" and the "record suggests it is

---

[47] *Id.*

[48] *See, e.g., In re Mallinckrodt PLC* [D.I. 6347] (confirming plan and approving nonconsensual third-party releases where directors and officers had not contributed to the trust directly but where opioid claimants received consideration in the form of a well-funded settlement trust).

[49] *See, e.g., Cont'l Airlines*, 203 F.3d 215 (finding that the lower court failed to consider whether "the release and permanent injunction were fair to Plaintiffs and were given in exchange for reasonable consideration," which differed from mass tort cases in which nonconsensual third-party releases were permissible, and finding "no evidence that the non-debtor D&Os had provided a critical financial contribution").

[50] *See, e.g., TK Holdings, Inc.,* No. 17-011375 (Bankr. D. Del. Feb. 21, 2018) (approving third-party releases and releasing directors and officers who did not make a financial contribution); *In re Insys Therapeutics, Inc.,* No. 19-11292 (Bankr. D. Del.) (KG) [D.I. 1121] (same).

unlikely that there are any material claims for liability against these non-debtors that are being

waived."[51] Any Released Claims against these parties are predicated on the Debtors' liability to

the Releasing Party. As set forth above, two of the other Released Parties, Patel, and UFVS, have

been named as defendants in the Pre-Petition Lawsuits[52] and no party has provided any basis to

believe that such parties could have any material direct Released Torts Claims against them. As a

result, the contributions articulated in this section I.C.2. of the memorandum justifies the Released

Parties' inclusion in the scope of the Third-Party Releases and Channeling Injunction, as they are

at least equivalent to the value of the Released Claims against such Parties.[53]

### 3.      Essential to the Reorganization

43.      Courts in this Circuit recognize that third-party releases are essential where the

releases are "critical to the success of the [p]lan" such that the plan depends on the non-debtor

released parties making contributions to the plan in exchange for the releases.[54] The Third-Party

Releases and Channeling Injunction are a condition precedent to the contributions from the

Released Parties that result in the claimants receiving a distribution under the Plan.[55] As an initial

matter, the Debtors' assets consist of the Roosevelt Inn (land and building) and some pre-paid

---

[51] *Mallinckrodt*, 2022 WL 404323, at *19.

[52] *See* Disclosure Statement at Art.III.B.

[53] *See, e.g., In re Armstrong World Indus., Inc.*, 348 B.R. 136, 156 (D. Del. 2006) ("In light of the benefits provided, or to be provided, to the Asbestos PI Trust on behalf of each PI Protected Party, the Asbestos PI Permanent Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Asbestos Personal Injury Claims against any PI Protected Party."); *In re Fed.-Mogul Global Inc.*, No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940, at *97 (Bankr. D. Del. Nov. 8, 2007) (finding that entry of injunction was fair and equitable "[i]n light of the substantial contributions to be made to the Trust by or on behalf of the Protected Parties"); *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 Bankr. LEXIS 3945, at *57-58 (Bankr. D. Del. Feb. 6, 2006) (finding that extension of channeling injunction to non-debtor protected parties was fair and equitable where debtors contributed $13 million to the trust on behalf of such parties).

[54] *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137; *see also Cont'l Airlines*, 203 F.3d at 215.

[55] Uzzo Decl. ¶31.

deposits and insurance.[56] None of these assets would provide creditors with the value that they are otherwise receiving under the Plan because as reflected on the Liquidation Analysis, a chapter 7 liquidation would not generate proceeds necessary to even satisfy the Chapter 11 Administrative Expense Claims in full, let alone pay any Priority Claims and/or General Unsecured Claims, following the payment of Secured Claims.[57] Moreover, as demonstrated in the liquidation analysis, creditors would need to obtain significant value from a source other than the Debtors if holders of Claims (other than the class 1 Secured Creditors) are going to receive a distribution similar to what they are slated to receive under the Plan. As such, the Released Parties' contributions under the Plan are essential to the reorganization, as they fund the recoveries to creditors. This Plan simply does not work without the Released Parties' contributions being made in exchange for the Third-Party Releases and Channeling Injunction.

### 4.    Significant Creditor Support

44.    The Bankruptcy Code does not require unanimous or even near-unanimous acceptance when approving nonconsensual releases and channeling injunctions. Cases with a similar release and channeling injunction structure as the provisions in this case have been approved with voting acceptance rates less than 90%, such as *Boy Scouts*,[58] *TK Holdings*,[59] and *Weinstein*.[60] Here, 100% of class 5 voted to accept the Plan and class 6 is deemed to have accepted

---

[56] Disclosure Statement, Ex. A.

[57] *Id*.;

[58] *Boy Scouts*, 642 B.R. at 607 (approving third-party release where 82.41% and 85.72% creditors in the affected classes voted to accept the plan).

[59] *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (approving third-party release where 74-78.18% of the affected classes voted to accept the plan).

[60] *In re The Weinstein Co. Holdings, LLC*, Case No. 18-10601 (MFW) (Bankr. D. Del. Jan. 26, 2021) [D.I. 3203] (approving third-party releases where 82.98% of the affected class voted to accept the plan).

the Plan.[61] Further, no class 6 creditor, nor any other voting class creditor, has objected to

confirmation of the Plan.  Therefore, the unanimous support that the Plan has received from all

creditor classes establish that this factor of *Master Mortgage* has been satisfied, and no party has

asserted otherwise.

> **5.      The Plan Provides a Mechanism for Payment of All or Substantially All Affected Claims**

45.    As set forth above, Class 1 Secured Claims are paid 100%, Class 2 Non-Tax

Priority Claims are paid 100% and Class 3 General Unsecured Claims are paid approximately

95% under the Plan. The Class 5 Direct Tort Claimants  agreed with the Debtors and other

Released Parties to the entry of the Channeling Injunction and Third-Party Releases in exchange

for, *inter alia*, the Settlement Trust Contribution to the Settlement Trust, the Trust Distribution

Procedures that provide the mechanism to evaluate and pay the Class 5 Direct Tort Claims, as

well as the Class 6 Indirect Tort Related Claims, if any, as evidenced by, and pursuant to, the

Plan Support Agreement filed with the Court.  Therefore, this *Master Mortgage* factor has been

satisfied, and no party has asserted otherwise.

> **6.      The Debtor Has Met Its Factual Burden Under *Continental* and the Third-Party Releases and Channeling Injunction Should be Authorized**

46.    The Third Circuit has held that nonconsensual third-party releases and channeling

injunction, while not *per se* permissible, may be approved when a debtor sets forth specific

factual evidence establishing that the releases are fair and necessary.[62] In addition to being fair

and necessary, courts in the Third Circuit have approved nonconsensual third-party releases

---

[61] No holder of a Class 6 Indirect Tort Related Claim submitted a Ballot; per the Solicitation Procedures Order, Class 6 is deemed to have voted for the Plan. *See* Solicitation Procedures Order, Exhibit 1 [D.I. 476].
[62] *Millennium Lab II*, 945 F.3d at 139 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions." (quoting *Continental*, 203 F.3d 203, 214 (3d Cir. 2000).

when a case presents "exceptional facts" to justify them.[63] No court has ever established a *per se* rule that mass tort cases are the only exceptional cases in which a nonconsensual third-party release and channeling injunctions are permissible. Nor would such a ruling be consistent with the rationale that courts have employed to grant nonconsensual third-party releases. The reasons why mass tort cases have been the archetype for third-party releases and injunctions is because of the vast nature of the claims and the unknown number of potential claimants—each of which must be examined in the context of the particular debtor and the facts and circumstances that pertain to that case. For example, in *Purdue* and *Boy Scouts*, the number of claims and claimants were in the thousands and there was a clear potential for unknown claimants.[64] Although the latter was true for *Blitz* and *Weinstein*, the former was not true, as the claims pool was small relatively.[65] Nevertheless, courts have found that non-consensual releases and injunctions were appropriate in both types of cases (*i.e.*, where there is either a small claims pool or a large claims pool) and there is the potential for unknown claimants.

47.     As of the Torts Claim Bar date, 15 Direct Tort Claims were filed in these Chapter 11 cases, five of which were the subject of Pre-Petition Lawsuits. The Pre-Petition Lawsuits

---

[63] *Millennium Lab II*, 945 F.3d at 29.

[64] *Boy Scouts*, 642 B.R. at 545 ("More than 100,000 proofs of claim were filed with Omni Agent Solutions . . . the claims agent, including 82,209 unique and timely claims asserting Abuse"); *In re Boy Scouts et al.*, No. 20-10343 (LSS) (Bankr. D. Del. Apr. 24, 2020) [D.I. 486] (appointing future claims representative); *see also In re Purdue Pharma, L.P.*, 633 B.R. 58 (Bankr. S.D.N.Y. 2021) (commenting on what was "likely the largest creditor body ever"), *vacated*, 635 B.R. 26, 62 (S.D.N.Y. 2021) (discussing over 600,000 filed claims); *see also In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. D. Del. June 3, 2021) [D.I. 2982] (proposing plan with channeling injunction for future personal injury claims).

[65] *In re The Weinstein Co. Holdings LLC*, No-18-10601 (MFW) (Bankr. D. Del. Nov. 17, 2020) [D.I. 3098] (disclosing that 65 tort claims were filed, including 55 sexual misconduct claims); *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. Dec. 19, 2013) [D.I. 2008] (disclosing that chapter 11 cases were filed to (among other things) resolve 36 lawsuits in which the debtors are defendants).

against the Debtors generally assert claims for negligence, alleging the sex trafficking occurred at various times from 2008 through 2015 at the Roosevelt Inn.

48.    In 2014, before the civil actions were commenced against the Debtors, Debtors learned that the FBI, as part of a broader nationwide mandate to disrupt sex trafficking operations, conducted surveillance of the Roosevelt Inn.  When Ms. Bersch learned of the investigation, she called the FBI and spoke with an agent to aid the investigation, pledging the cooperation and support of herself and the hotel.  Patel, acting in his capacity as an employee and general manager of the Roosevelt Inn, also routinely cooperated with various law enforcement agencies over the course of his employment at the Roosevelt Inn.  Ms. Bersch's contact and communication with the FBI to answer any questions the FBI had about the Roosevelt Inn, and Patel's similar assistance to law enforcement, highlight that the Roosevelt Inn always fully cooperated with all law enforcement agencies that requested assistance.  In the end, neither the FBI, nor any other law enforcement agency, charged any employee or owner of the Roosevelt Inn with any crime associated with sex trafficking, and the Philadelphia District Attorney's Office never attempted to shut down the Roosevelt Inn as a public nuisance.[66]

49.    Several traffickers were charged by the United States Attorney for the Eastern District of Pennsylvania and the District Attorneys' Offices of Philadelphia and Bucks Counties, and were ultimately convicted of sex trafficking crimes they committed at various Philadelphia hotels, including the Roosevelt Inn.  The traffickers have consistently testified that they went out of their way to conceal their actions and activities.  They also testified that the employees of the Roosevelt Inn were not aware of their actions, and that the Roosevelt Inn

---

[66] First Day Decl. ¶¶ 14-17; Disclosure Statement at Art.III.A.

would throw out any guest who was caught breaking the rules, breaking the law, or disruptive, and maintained a list of guests who were permanently banned from ever staying at the hotel again.[67]

50.    While this case is not a "mass tort" in the traditional sense, the sex traffickers' conduct at issue that led to the civil actions and, ultimately to the Debtors' Chapter 11 Cases, is undeniably exceptional in nature and scope.  The best opportunity for a meaningful recovery is not from the Debtors alone, but from the contributions of the other Released Parties, only two of whom were named in the Pre-Petition Lawsuits and who likely have no legally cognizable liability with respect to the sex traffickers' conduct. Nonetheless, the Released Parties agree to fund their respective contributions in exchange for a Channeling Injunction and the Third-Party Releases to ensure that their substantial contributions provide them with finality.

51.    The contributions and support of the Released Parties are essential to maximizing value to creditors that would otherwise receive nothing under the Plan and, in that light, the contributions of the Released Parties are extraordinary. As explained above, the Debtors' assets are nowhere near sufficient to provide claimants with the distributions that they will receive under the Plan. Consequently, the closure that the Third-Party Releases and Channeling Injunction will provide to Released Parties are essential to securing the substantial contributions that ensure holders of Claims receive ***something*** rather than nothing from the restructuring process, and facilitates the global resolution of the Direct Tort Claims per the Trust Distribution Procedures.

52.    Without these substantial contributions that effectively facilitate the resolution of all disputes, the Debtors' creditors would have been significantly worse off and would have had

---

[67] First Day Decl. ¶¶ 18-19; Disclosure Statement at Art.III.A.

to endure the burden of an uncertain litigation to obtain any recovery, let alone a meaningful recovery.

### D.   The Debtors' Releases

53.   Section 1123(b)(3)(A) of the Bankruptcy Code provides for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[68] Courts in this district have found that chapter 11 debtors are generally allowed to release claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, fair, reasonable, and in the best interests of the estate."[69] Whether a debtor's release of third parties satisfies this standard is based on the facts and equities of each case.[70] In addition, certain decisions from this district apply the *Master Mortgage* factors, used when considering nonconsensual releases, which is articulated above to evaluate the appropriateness of a debtor's releases.[71] The Debtors' Release in this case meets the applicable standards.

---

[68] *Spansion*, 426 B.R. at 143.

[69] *Id.* at 143 ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); *see also In re Aleris Int'l, Inc.,* Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan"); *In re AAI Pharma*, No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) (A debtor can "can elect to release claims as part of the plan and as part of the fresh start, concentrating on the business affairs and forgetting about litigation that may have questionable value or no value at all, just to settle past scores of charges and expressions of discontent." and "[T]he debtor should be given considerable latitude in addressing" whether to release claims as part of its plan.) [D.I. 893]; *In re Aleris Intern., Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of the plan" as part of the plan negotiation process").

[70] *See, e.g.*, *Spansion*, 426 B.R. at 143 (noting that "the record does not reflect that there is any pending litigation in [that] case that would be discontinued by such a release" and citing *In re DBSD North America, Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009), which "approv[ed] a debtor's release of third parties when the debtor testified that it was unaware of any significant potential claims that were being released," *aff'd in part*, 627 F.3d 496 (2d Cir. 2010)).

[71] *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

Furthermore, the Debtors' Release contains a carve out for actual fraud, gross negligence, or willful misconduct.

54.     The Debtors' decision to grant the Debtors' Release is a sound exercise of their business judgment. The Debtors, with the assistance of the Debtors' advisors, have performed a review of chapter 5 claims to be released under the Plan.[72] Based on that review, the Debtors believe that "the total value provided by the Released Parties exceed the net value of any claims to be released by the Debtors and the proposed Plan (including the Debtors' Releases) is in the best interests of the Debtors' estate.

55.     Moreover, there is no question that the Released Parties, including the equity Security Holders, UFVS and Patel provided (and continue to provide), valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their prepetition responsibilities) to the Debtors' restructuring efforts throughout this chapter 11 process. Prosecution of the avoidance claims released under the Debtors' Release would be complex and time consuming and could mire the Debtors and parties in interest in litigation rather than effectuating a consensual restructuring. Simply put, the Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. This is because the potential claims being released had, at best, minimal value, and the value of settlement, compromise, and the confirmation of the Plan without undue delay and with the broad support of stakeholders in all classes outweighed any value that could be

---

[72]Harris Decl. ¶ 7

achieved by pursuing potential claims and causes of action that the Debtors could assert against the Released Parties.[73] Importantly, the Debtors' Release provides finality and avoids significant delay and, as noted above carves out actual fraud, gross negligence and/or willful misconduct. As such, the Debtors' Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

## II. The Plan Satisfies the Remaining Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code

56.    Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. Each of the applicable requirements has been met in these Chapter 11 Cases, as set forth below.

### A.    Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code

57.    Section 1129(a)(1) of the Bankruptcy Code provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[74] The legislative history of section 1129(a)(1) explains that this provision incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code that govern classification of claims and contents of a plan, respectively.[75] Here, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code and, thus, section 1129(a)(1) of the Bankruptcy Code.

#### 1.    Claims and Interests Have Been Classified Properly in the Plan in Accordance with Section 1122 of the Bankruptcy Code

58.    Section 1122(a) of the Bankruptcy Code provides, in pertinent part,  that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially

---

[73] *Id*.

[74] 11 U.S.C. § 1129(a)(1).

[75] H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977).

similar to the other claims or interests of such class."[76] A plan proponent has significant flexibility in classifying claims and interests into multiple classes under section 1122(a) of the Bankruptcy Code, provided that there is a reasonable basis to do so[77] and all claims or interests designated to a particular class are substantially similar to each other.[78] Claims are substantially similar with one another if they have a "legal character" or "if they exhibit a similar effect on the debtor's bankruptcy estate."[79] In addition, is not necessary that all substantially similar claims or interests be designated in the same class.[80]

59.    The Plan provides for the separate classification of Claims and Interests based upon differences in the legal nature or priority of such Claims and Interests. More specifically, the Plan designates the following classes of Claims and Interests:

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Impaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Non-Tort Litigation Claims | Impaired | Entitled to Vote |

[76] 11 U.S.C. § 1122(a).

[77] *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that a classification is proper as long as each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

[78] *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

[79] *In re W.R. Grace & Co.*, 475 B.R. 34, 109 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013).

[80] *In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012), *aff'd as modified*, No. 08–13141 (KJC), 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015).

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| **5** | Direct Tort Claims | Impaired | Entitled to Vote |
| **6** | Indirect Tort Related Claims | Impaired | Entitled to Vote |
| **7** | Interests in RI | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| **8** | Interests in RMI | Unimpaired | Not Entitled to Vote (Presumed to Accept) Sponsor's Interest |

60.     No party has objected to the Plan's classification structure. No holder of a Claim in a voting class has objected to confirmation of the Plan.  Each Class contains only Claims or Interests that have the same legal rights or the same "effect on the debtor's bankruptcy estate."[81] Claims and Interests assigned to each Class are substantially similar to the other Claims and Interests in such class, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on relevant criteria.  (*See* Plan, Art.II.A and B).  For instance, all Claims in Class 1 are secured as a matter of state law, and the Claims in Class 2 are Non-Tax Claims entitled to priority pursuant to section 507 of the Bankruptcy Code. Specifically, the Plan bifurcates general unsecured claims based on whether they relate to Tort Claims.  (See Plan, Art.II.B.3, 4, 5, 6).  The division of general unsecured claims is appropriate because a fundamental purpose of the Plan is to channel and compensate Class 5 Direct Tort Claims and Class 6 Indirect Tort Related Claims that are sufficiently distinct from the other unsecured claims as to "merit a separate voice" for purposes of Plan confirmation.[82] Class 4 (Non-Tort Litigation Claims) contain

---

[81] *W.R. Grace.*, 475 B.R. at 109.
[82] *See In re Armstrong World Indus., Inc.*, 348 B.R. 136,147 (holding that it was reasonable to separately classify personal injury claims and general unsecured claims despite their equal priority status); *In re Tribune Co.*, 476 B.R.

contingent and unliquidated litigation Claims against the Debtors that are neither impacted by the Channeling Injunction or Third-Party Releases, nor benefit from the Reorganized Debtors' contribution to the Settlement Trust, but which may have separate insurance coverage proceeds from which to recover under the Plan  (*See* Plan, Art.II.B.4) but, of course, Class 4 is considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code.  Class 3 (General Unsecured Claims) contains all remaining General Unsecured Claims, which are predominantly trade claims, and which will recover from the GUC Fund funded by the Reorganized Debtors under the Plan.[83] (*See* Plan, Art.II.B.3). And Classes 7 and 8 contain only membership interests in the respective Debtors. Because each Class of Claims and Interests contains only substantially similar Claims or Interests, the Plan's classification structure complies with section 1122 of the Bankruptcy Code.

### 2.    The Plan Complies with Section 1123(a) of the Bankruptcy Code

61.    Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply.[84] The Plan fully complies with each such requirement for the reasons stated below.

---

843, 857 (Bankr. D. Del. 2012) (finding separate classification of claims was reasonable where distinguishable creditor interests warranted a "separate voice in [the] bankruptcy case").

[83] *See In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (holding plan "reasonably classified claims for indemnification and contribution [premised on asbestos liabilities] together with direct personal injury claims"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 247 (Bankr. S.D.N.Y. 2007) (holding reasonable separate classification of generally liquidated trade claims from unliquidated litigation and rejection damage claims where trade claims were insulated against the risk that the reserves set aside for the litigation and rejection damage claims were not capable of precise estimation); *Armstrong World Indus.*, 348 B.R. at 159 (holding reasonable separate classification of personal injury claims and general unsecured claims); *In re U.S. Mineral Prods. Co.*, No. 01-2471 (JKF), 2005 Bankr. LEXIS 3259, at *61 (Bankr. D. Del. Nov. 29, 2005) ("The Plan properly classifies Litigation Claims in a separate class").

[84] *See* 11 U.S.C. § 1123(a).

(a)     **Section 1123(a)(1): Designation of Classes of Claims and Interests**

62.     Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims and classes of equity interests subject to section 1122 of the Bankruptcy Code. As discussed in section II.A.1 herein, the Plan designates six Classes of Claims and two Classes of Interests in compliance with section 1122. Accordingly, the Plan satisfies section 1123(a)(1) of the Bankruptcy Code.

(b)     **Section 1123(a)(2): Unimpaired Classes**

63.     Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify which classes of claims or interests are unimpaired. Article II of the Plan identifies Classes 1, 2, 7 and 8 as Unimpaired and sets forth their treatment therein. [85] Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(c)     **Section 1123(a)(3): Treatment of Impaired Classes**

64.     Section 1123(a)(3) of the Bankruptcy Code requires a plan to "specify the treatment of any class of claims or interests that is impaired under the plan." Article II of the Plan identifies Classes 3, 4,[86] 5 and 6 as Impaired and discloses the specific treatment for the Claims in each Impaired Class.[87] Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(d)     **Section 1123(a)(4): Equal Treatment Within Each Class**

65.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the "same treatment for each claim or interest of a particular class, unless the holder of a particular claim or

---

[85] *See* Plan, Art.II.A and.B.

[86] Pursuant to Article IV.F of the Disclosure Statement and Article II.9 of the Plan, Class 4 is considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan,

[87] *Id*.

interest agrees to a less favorable treatment of such particular claim or interest."[88] Under the Plan,

each Claim against or Interest in the Debtor in each respective Class is receiving the same treatment

as the other Claims or Interests in the particular Class in compliance with section 1123(a)(4) of the

Bankruptcy Code or has agreed to a less favorable treatment.[89] No Holder of a Claim has objected

to the Plan under section 1123(a)(4). As a result, even if the Plan provided unequal treatment to

any Class of Claims or Interests, the holders of such Claims or Interests "agree[d]" to such "less

favorable treatment." The Plan therefore satisfies section 1123(a)(4).

### (e)   Section 1123(a)(5): Adequate Means for Implementation

66.   Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate

means for the plan's implementation."[90] Article V of the Plan provides adequate and proper means

for the implementation of the Plan, including (a) the creation of the Settlement Trust; (b) the

transfer of the Settlement Trust Assets to the Settlement Trust, including, but not limited to, the

Settlement Trust Contribution; (c) the mechanism by which the universe of Tort Claims shall be

permanently **channeled** to the Settlement Trust pursuant to the Channeling Injunction and

administered in accordance with the Trust Distribution Procedures; (d) the establishment and

funding of the Professional Fee Reserve for the payment and satisfaction of the Allowed

Professional Fee Claims; (e) the establishment and funding of the GUC Fund for the payment and

satisfaction of the Allowed General Unsecured Claims; (f) the authority to execute, deliver and

enter into the Exit Financing Documents and related documentation governing the Exit Financing

without the need for any further corporate action or any further notice to or order of the Bankruptcy

---

[88] 11 U.S.C. § 1123(a).

[89] *See* Plan, Art. III(B) (specifying treatment applicable to all Claims and Interests in each Class).

[90] 11 U.S.C. § 1123(a)(5).

Court; (g) the payment and satisfaction of any other Allowed Claims; (h) the continued legal existence of both RI and RMI and the merger of the Reorganized RI with the Reorganized RMI with the Reorganized RI being the surviving entity; (i) the identification and appointment of the Reorganized Debtors' Officers and Directors; (j) the authorization for the Debtors to take corporate actions necessary to effectuate the Plan; (k) the exemption from mortgage recording taxes and other taxes of any transfers of property pursuant to the Plan under section 1146(a); and (l) the preservation of Certain Causes of Action as set forth in Article X.B of the Plan. The precise terms governing the execution of these transactions are set forth in greater detail in the Plan. Accordingly, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### (f)        Section 1123(a)(6): Non-Voting Equity Securities

67.        Section 1123(a)(6) of the Bankruptcy Code requires a debtor to include a provision in its constitutive documents prohibiting the issuance of non-voting equity securities.[91] The Plan is clear that the Interests in RI and the Interests in RMI "shall remain unchanged and equal to the structure that existed on the Petition Date." (*See* Plan, Art.II.B.7 and 8). Accordingly, the Plan satisfies the requirements of section 1123(a)(6).

### (g)        Section 1123(a)(7): Designation of Directors and Officers

68.        Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."[92] In the Plan Supplement, the Debtors disclosed that, as of the Effective Date, (i) the Reorganized RI shall retain Anthony Uzzo and

---

[91] 11 U.S.C. § 1123(a)(6).

[92] 11 U.S.C. § 1123(a)(7).

Blanche Bersch as Mangers and (ii) the Reorganized RMI shall retain Anthony Uzzo as Director

and Vice President and Blanche Bersch as Director and Secretary.[93]   Accordingly, the Plan

satisfies the requirements of section 1123(a)(7).

### (h)      Section 1123(a)(8): Postpetition Personal Service Payments

69.      Section 1123(a)(8) of the Bankruptcy Code does not apply to the Plan. That

provision requires that plans of individual debtors pay creditors the earnings from personal

services performed by the debtor after the petition date.[94] Because the Debtors are not

individuals (as such term is defined in the Bankruptcy Code), section 1123(a)(8) is inapplicable.

### 3.      The Plan Complies with Section 1123(b) of the Bankruptcy Code

70.      Section 1123(b) of the Bankruptcy Code sets forth certain discretionary provisions

that may be incorporated into a chapter 11 plan. The contents of the Plan are consistent with these

provisions.

### (a)      Section 1123(b)(1): Impairment of Claims and Interests

71.      Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or

leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. §

1123(b)(1). The Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically,

as discussed above, Classes 1, 2, 7 and 8 are Unimpaired because the Plan leaves unaltered the

legal, equitable, and contractual rights of the holders of Claims or Interests within such

Classes.[95] On the other hand, Classes 3, 4,[96] 5 and 6 are Impaired because the Plan modifies

---

[93] *See* Plan Supplement, Ex. C, Disclosure of Reorganized Debtors' Officers and Directors.

[94] 11 U.S.C. § 1123(a)(8).
[95] 11 U.S.C. § 1124.

[96] Pursuant to Article IV.F of the Disclosure Statement and Article II.9 of the Plan, Class 4 is considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan,

the rights of the holders of Claims within such Classes.[97] The Plan's treatment of the various

Classes complies with section 1123(b)(1) of the Bankruptcy Code.

> **(b)** **Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Lease**

72.    Section 1123(b)(2) of the Bankruptcy Code allows a plan to provide for

assumption, assumption and assignment, or rejection of executory contracts and unexpired

leases pursuant to section 365 of the Bankruptcy Code. Article VI.A of the Plan provides that,

as of the Effective Date, each of the Debtor's Executory Contracts and Unexpired Leases shall

be deemed assumed by the Reorganized Debtor unless limited exceptions are met, including if

any such Executory Contracts or Unexpired Leases are identified on the Rejected Executory

Contracts and Unexpired Leases Schedule.[98] The Debtor filed the Schedule of Rejected

Contracts and Unexpired Leases with the Plan Supplement, Exhibit D, which provided that

there are no Executory Contracts and Unexpired Leases that will be rejected  pursuant to the

Plan.[99] Accordingly, the Plan discloses how Executory Contracts and Unexpired Leases will be

treated under the Plan, and is therefore consistent with section 1123(b)(2) of the Bankruptcy

Code.

> **(c)** **Section 1123(b)(3): Settlement of Claims or Interests by the Debtor**

73.    Through the Plan, the Debtors have agreed to voluntary settlements with, and the

release of estate claims against, various parties, which the Court should approve under section

1123(b) of the Bankruptcy Code. That provision states that a chapter 11 plan may provide for "the

---

[97] *Id*.

[98] Plan, Art. V.A.

[99] *See* Plan Supplement, Ex. D, Schedule of Rejected Contracts and Unexpired Leases.

settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[100] "The standards for approval of a settlement under section 1123 are generally the same as those under [Bankruptcy] Rule 9019," which provides that courts may approve a "compromise or settlement" after appropriate notice and a hearing.[101] In addition, sections 363(b)(1) and 363(f) of the Bankruptcy Code permit a debtor in possession to dispose of property of the estate "other than in the ordinary course of business" after notice and a hearing and to sell assets free and clear notwithstanding liens, claims, and interest of other parties in the property to be sold.[102] These provisions when read together provide the Court with broad discretion and authority to approve the settlements under the Plan.

74.    Settlements are encouraged and "generally favored in bankruptcy" proceedings.[103] Courts should consider whether "the compromise is fair, reasonable, and in the best interest of the estate" when deciding whether to approve a settlement.[104] "[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."[105] Moreover, the Court does not need to "have a mini-trial" of the underlying

---

[100] 11 U.S.C. § 1123(b)(3)(A).

[101] *In re Coram Healthcare Corp.*, 315 B.R. 321, 334 (Bankr. D. Del. 2004); Fed. R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008) ("[T]he standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. 9019.").

[102] *See* 11 U.S.C. §§ 363(b)(1), 363(f).

[103] *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *Martin*, 91 F.3d at 393; *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979).

[104] *In re Louise's Inc.*, 211 B.R. 798, 801 (Bankr. D. Del. 1997).

[105] *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257-58 (Bankr. S.D.N.Y. 2016) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

disputes or determine that the settlement is the best possible result for all parties.[106] Rather, the Court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."[107] Whether a settlement should be approved under this provision lies within the bankruptcy court's sound discretion, particularly "in light of the general public policy favoring settlements."[108]

75.    In determining whether to approve a settlement, courts in the Third Circuit ultimately consider the following four "*Martin* factors": (a) "the probability of success in litigation"; (b) "the likely difficulties in collection"; (c) "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"; and (d) "the paramount interest of the creditors."[109] The Court should also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."[110] Accordingly, "the ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interests of the estate.'"[111]

76.    The Plan embodies and implements compromises and settlements of numerous issues among the Debtors, Direct Tort Claimants, Equity Security Holders and related parties designed to achieve an economic settlement of Claims against the Debtors and fair and efficient resolution of the Chapter 11 Cases. The comprehensive settlement embodied in the Plan (the

---

[106] *W.R. Grace*, 475 B.R. at 77-78 (citing *Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (D.N.J. 2000)).

[107] *Id*. at 78 (quoting *Travelers Cas. & Sur. Co. v. Future Claimants Representative*, No. Civ. A. 07-2785, 2008 WL 021088, at *5 (D.N.J. Mar. 25, 2008) (emphasis added).

[108] *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 514 (Bankr. D. Del. 2010) (quoting *In re Hibbard Brown & Co*., 217 B.R. 41, 46 (Bankr. S.D.N.Y 1998)); *World Health Alts.*, 344 B.R. at 296.
[109] *Martin*, 91 F.3d at 393.

[110] *Nutritional Sourcing*, 398 B.R. at 833 (quoting *In re Marvel Entm't Grp., Inc*., 222 B.R. 243, 249 (D. Del. 1998)).

[111] *Marvel*, 222 B.R. at 249 (quoting *Louise's*, 211 B.R. at 801); *see also In re Washington Mutual Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (citation omitted).

"<u>Settlement</u>") provides mechanisms by which (a) the universe of Tort Claims shall be permanently *channeled* to the Settlement Trust pursuant to the Channeling Injunction and administered in accordance with the Trust Distribution Procedures *in full satisfaction and release* of any and all such Tort Claims against the Released Parties   and all of the Released Parties shall receive the benefit of the Injunctions and Releases set forth in the Plan, (b) the Avoidance Actions shall be released as of the Effective Date of the Plan, and (c) the allocation of recoveries between the Settlement Trust and the Direct Tort Claimants on account of the claims of the Direct Tort Claimants and the Debtors (or after the Effective Date, the Settlement Trust) have been resolved as set forth in the Plan and in the Trust Distribution Procedures.

77.    The Settlement also provides for the Released Parties to contribute $1,140,000 to the Reorganized Debtors and to facilitate the procurement of the Exit Financing in the amount of $2,100,000 from the Exit Lender, as well as for the Reorganized Debtors to make the Settlement Trust Contribution to the Settlement Trust.

78.    The Settlement is fair and equitable and within the bounds of reasonableness, and the Plan specifically constitutes a good faith compromise and settlement by, between and among the Released Parties on one hand, and the holders of Tort Claims on the other, which settlement has been overwhelmingly approved by creditors (unanimously approved by all creditors who submitted a Ballot), which easily satisfies the *Martin* standard and which is a valid exercise of the Debtors' business judgment.  Accordingly, the Settlement should be approved.

### 4.    Section 1123(b)(6): The Discretionary Provisions Under the Plan Should Be Approved

79.    Section 1123(b)(6) provides that a plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."[112] Here, in addition to the

Third-Party Releases and Channeling Injunction set forth above, the Plan also contains an exculpation provision and injunction provisions. These provisions comply with the Bankruptcy Code and prevailing law because, among other things, they are the product of extensive good faith, arms'-length negotiations that are necessary to the Plan's implementation. Each of these provisions should be approved for the reasons stated below.

(a)      <strong>The Exculpation Provision</strong>

80.      Article X.K of the Plan provides, among other things, that each Exculpated Party is exculpated from any Cause of Action for any claim relating to any act or omission from the Petition Date to the Effective Date relating to the Chapter 11 Cases, the negotiation of the Plan Documents, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith, willful misconduct, or fraud).The exculpation provision of the Plan is standard, appropriate, and should be approved. Exculpation provisions are "commonplace" and do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation between a releasing party against an Exculpated Party for acts arising out of the Debtor's restructuring.[113]

81.      The Debtors also believe that the exculpation provision is necessary to protect parties who have made substantial contributions to the Debtors' reorganization from collateral

---

[112] 11 U.S.C. §§ 1123(b)(6).

[113] *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision is "a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

attacks related to their good faith acts or omissions in effecting the Debtors' successful restructuring during the chapter 11 cases.[114] Put simply, the Debtors could not have developed the Plan without the support of the Exculpated Parties. Thus, the exculpation provision is consistent with applicable law (no party has asserted otherwise) and such provision should be approved in connection with the Confirmation of the Plan.

### (b)      The Injunction Provisions

82.      Article X.F, X.H, X.I and X.L are the injunction provisions in the Plan, including the Channeling Injunction, the Insurance Entity Injunction, the Injunction against Interference with the Plan and the Injunctions Related to Releases and Exculpation. The injunctions are necessary to preserve and enforce the Releases and Exculpation provision in the Plan and are narrowly tailored to achieve that purpose. The Third Circuit in *Continental* indicated that fairness and necessity principles, including the *Master Mortgage* factors, apply to both releases and the injunctions that effectuate such releases.[115] As explained above, the releases are proper under applicable law, and, accordingly, the injunction provisions tailored thereto should be approved.[116]

---

[114] *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case").

[115] *See Continental,* 203 F.3d at 217 & n.17.

[116] *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992); *see also In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756, at *61 (Bankr. D. Del. Feb. 21, 2018) ("The injunctions are necessary to preserve and enforce the releases and are narrowly tailored to achieve that purpose."); *In re Regent Commc'ns, Inc.*, No. 10-10632 (KG), 2010 Bankr. LEXIS 5793, at *18-19 (Bankr. D. Del. Apr. 12, 2010) ("The injunction provisions set forth in Article X.F of the Plan are necessary to preserve and enforce the release, exculpation, non-debtor release and injunction provisions . . . of the Plan and are narrowly tailored to achieve that purpose."); *In re Drug Fair Grp., Inc.*, No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984, at *16 (Bankr. D. Del. June 7, 2010) ("The injunction provision set forth in Section 9.2 of the Plan . . . is necessary to preserve and enforce the Release and the Exculpation, and the Injunction is narrowly tailored to achieve this purpose."). Courts in this district routinely approve similar injunctions. *See, e.g.*, *In re Am. Apparel, Inc.,* No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331, at *250 (Bankr. D. Del. Jan. 27, 2016); *In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) [D.I. 816]; *In re Stallion Oilfield Servs.*, No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500, at *70 (Bankr. D. Del. Jan. 20, 2010); *In re Masonite Corp.*, No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698, at *66 (Bankr. D. Del. May 29, 2009).

**B.      Section 1129(a)(2): The Debtors' Compliance with Applicable Provisions of the Bankruptcy Code**

83.      Section 1129(a)(2) of the Bankruptcy Code requires the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."[117] The legislative history of section 1129(a)(2) informs that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.[118]

**1.      Section 1125: Postpetition Disclosure Statement and Solicitation**

84.      Section 1125(b) of the Bankruptcy Code prohibits the Debtor from soliciting acceptances or rejections of the Plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, a written disclosure statement, approved after notice and a hearing, by the court as containing adequate information."

85.      The Debtors have satisfied section 1125. On June 15, 2023, before votes were solicited on the Plan, the Court entered an order approving the Disclosure Statement as containing adequate information and approving the Solicitation Procedures for soliciting and tabulating the votes. The Debtors complied with the Solicitation Procedures Order and the Solicitation Procedures by mailing Solicitation Packages to holders of Claims in the Voting Classes; provided however that, in accordance with the Solicitation Procedures, the Debtors distributed Solicitation

---

[117] 11 U.S.C. § 1129(a)(2).

[118] *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Lapworth*, No. 97-34529, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The adequacy of disclosure is an essential element for plan confirmation embodied in the § 1129(a)(2) confirmation requirement."); *In re Natural Products Grp., LLC*, No. 10-10239 (BLS), 2010 WL 2745983, at *8 (Bankr. D. Del. Feb. 22, 2010) ("Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the applicable provisions of title 11, including, specifically, sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules and the Scheduling Order governing notice, disclosure and solicitation in connection with the Plan, the Disclosure Statement, the Solicitation Procedures, the Plan Documents and all other matters considered by the Court in connection with these Cases."); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

Packages and Ballots with respect to Class 5 Claims only to their known attorneys and not to the

holder of the Direct Tort Claims. The Debtors' original mailing included (a) a USB Flash Drive

containing (i) the Solicitation Procedures Order, (ii) the Disclosure Statement with all exhibits (to

the extent such exhibits were filed with the Court before the Solicitation Date), (iii) the Plan with

all exhibits (to the extent such exhibits were filed with the Court before the Solicitation Date); (b)

a paper copy of a Cover Letter to Holders of Claims Entitled to Vote on the Plan; (c) a paper copy

of the Confirmation Hearing Notice, (d) a paper copy of the appropriate form of Ballot with return

instructions and return pre-addressed envelope and, where appropriate, (e) a paper copy of the

Non-Voting Status Notice (some copies of the Non-Voting Status Notice were delivered via e-

mail).[119] In compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan

from any holder of a Claim prior to entry of the Solicitation Procedures Order.

86.    Accordingly, the Debtors complied with their solicitation and disclosure

obligations under section 1125(b).

## 2.    Section 1126: Acceptance of the Plan

87.    Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes

on a chapter 11 plan and determining acceptances thereof. Under section 1126, only holders of

allowed Claims and Interests in Impaired Classes that will receive or retain property under a plan

on account of such Claims or Interests may vote to accept or reject a plan.[120] The Voting Classes

included Class 3 (General Unsecured Claims), Class 4 (Non-Tort Litigations Claims),[121] Class 5

(Direct Tort Claims), and Class 6 (Indirect Tort Related Claims). The Debtors did not solicit votes

---

[119] *See* Certificate of Service [D.I.506].

[120] 11 U.S.C. §§ 1126(a), (f), (g).

[121] Pursuant to Article IV.F of the Disclosure Statement and Article II.9 of the Plan, Class 4 is considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

from any holders of Claims in Class 1 (Secured Claims) or Class 2 (Priority Non-Tax Claims), as such Classes were Unimpaired and presumed to have accepted the Plan.[122] The Debtors did not solicit votes from any holders of Interests in Class 7 or Class 8 (Interests), as such Classes Unimpaired and presumed to have accepted the Plan.[123] Accordingly, the Debtors complied with section 1126 of the Bankruptcy Code by only soliciting votes from holders of Claims that were not presumed to accept or deemed to reject the Plan.

### C.   Section 1129(a)(3): The Plan Has Been Proposed in Good Faith

88.   Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."[124] The Third Circuit has held that "the important point of inquiry" when deciding whether this requirement is met "is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[125] In other words, there must be "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11.[126] If there is a "legitimate and honest purpose to reorganize" and the plan "exhibited a fundamental fairness in dealing with creditors" and "has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied."[127] "The bankruptcy judge is in the best position to assess the good faith

---

[122] 11 U.S.C. §§ 1126(f).

[123] 11 U.S.C. §§ 1126(f).

[124] 11 U.S.C. § 1129(a)(3).

[125] *PWS Holding*, 228 F.3d at 242 (internal quotations, citations, and modifications omitted).

[126] *See In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *see also Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (interpreting the standard as requiring a showing that "the plan was proposed with honesty and good intentions") (internal citation omitted).

[127] *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985) (internal citation omitted); *W.R. Grace & Co.,* 475 B.R. at 79 (internal citation omitted).

of the parties' proposals."[128] This good-faith assessment is done on a case-by-case basis and performed in light of the totality of the circumstances surrounding the establishment of the chapter 11 plan.[129] Courts have "considerable discretion in finding good faith."[130]

89.     No party has objected to the Plan on good faith grounds and the Debtors' good faith is manifest. The Debtors proposed the Plan with the legitimate and honest purpose of preserving their limited assets and their ability to continue to operate their hotel, allowing the Insurance Actions to be determined by a court of competent jurisdiction and the allowance of the Tort Claims in accordance with the provisions of the Trust Distribution Procedures, while maximizing recoveries for the Debtors' creditors, especially the holders of the Direct Tort Claims.  The Plan is the product of extensive arm's-length negotiations by and among the Debtors, the Direct Tort Claimants, unsuccessful mediations among the Insurance Companies, Direct Tort Claimants and Debtors, and additional negotiations among the Debtors and certain insurance companies.[131]   The Debtors only proceeded to seek confirmation of the Plan following the execution of the Plan Support Agreement underscoring the unanimous support of the most important stakeholders in these cases – the holders of the Direct Tort Claims. The Settlement embodied in the Plan is fundamentally fair to creditors. As set forth above, no creditor objects to the confirmation of the Plan. That the Plan has unanimous support from the Debtors' creditor constituencies demonstrates that the Plan is fundamentally fair to creditors, serves a legitimate bankruptcy purpose, and is

---

[128] *In re Chemtura Corp.,* 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010).

[129] *Id.*

[130] *See W.R. Grace,* 475 B.R. at 79.

[131] *See* Uzzo Decl. ¶¶ 7-8.

proposed in good faith. Accordingly, the Court should determine that the Debtors have satisfied

section 1129(a)(3) of the Bankruptcy Code. and presumed to have accepted the Plan

    **D.**    **Section 1129(a)(4): The Payment for Certain Services or for Certain Costs and Expenses Is Subject to Court Approval**

90.    Section 1129(a)(4) of the Bankruptcy Code states that "any payment made or to be

made by the proponent, by the debtor, or by a person issuing securities or acquiring property under

the plan, for services or for costs and expenses in or in connection with the case, or in connection

with the plan and incident to the case, has been approved by, or is subject to the approval of, the

court as reasonable." [132] This section requires a bankruptcy court to review and approve

professional fees as reasonable before the estate remits payment on account of such fees through

a plan.[133]

    91.    All payments made or to be made by the Debtors under the Plan for services or for

costs and expenses in connection with the Chapter 11 Cases are subject to the approval of the Court

as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code. Article III.A.2 of the

Plan provides "[a]ll Professionals or other Persons requesting the final allowance and payment of

compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b)

for services rendered during the period from the Petition Date to and including the Effective Date

shall file and serve final applications for allowance and payment of Professional Fee Claims on

counsel to the Debtors and the United States Trustee no later than the first Business Day that is

forty-five (45) days after the Effective Date," and that all such Professional Fee Claims are subject

to the Court's approval.[134] Further, Article XI.C of the Plan provides that the Court will retain

---

[132] 11 U.S.C. § 1129(a)(4).

[133] *See In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *159 (Bankr. S.D.N.Y. Oct. 31, 2003).
[134] Plan, Art. III.

jurisdiction to, among other things: " hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code,"[135] and "hear and determine the Allowance and/or Disallowance of any Claims, including Administrative Expense Claims, against or Interests in the Debtors or their Estates, including any objections to any such Claims or Interests, and the compromise and settlement of any Claim, including Administrative Expense Claims, against or Interest in the Debtors or their Estates." [136] Accordingly, the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

> **E.    Section 1129(a)(5): The Debtors Have Disclosed Information Regarding the Reorganized Debtors' Officers and Directors**

92.    Section 1129(a)(5) of the Bankruptcy Code requires that (a) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor, (b) the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (c) there be disclosure of the identity and compensation of any insiders that the reorganized debtors intend to retain or employ.[137] As set forth above, after the Effective Date, (i) Anthony Uzzo and Blanche Bersch shall continue to serve as Mangers of the Reorganized RI and (ii) Anthony Uzzo shall continue to serve as Director and Vice President and Blanche Bersch shall continue to serve as Director and Secretary of the Reorganized RMI.[138] The post-Effective Date continuation of Mr. Uzzo and Ms. Bersch in these roles aligns with the best interests of the creditors, the equity security holders and

---

[135] Plan, Art. XI.C.8

[136] Plan, Art. XI.C.12

[137] 11 U.S.C. § 1129(a)(5).

[138] Plan Supplement, Ex.C, Reorganized Debtors' Officers and Directors.

public policy.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

> ### F.    Section 1129(a)(6): The Plan Does Not Require Governmental Regulatory Approval of a Rate Change

93.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  This section is inapplicable to the Plan as the Debtors are not subject to such rate regulation.

> ### G.    Section 1129(a)(7): The Best Interests Test Has Been Satisfied

94.    Section 1129(a)(7) of the Bankruptcy Code sets forth the "best interests test."[139] This test requires that each holder of a claim or an equity interest in a particular class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that, as of the plan's effective date, is not less than the amount that such holder would so receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[140]

95.    This "best interests" test applies to individual dissenting holders of claims and interests rather than classes[141] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of the debtor's estate against the estimated recoveries under the debtor's plan of reorganization.[142] As the language of

---

[139] 11 U.S.C. § 1129(a)(7)(A).

[140] *Id.*; *see also 203 N. LaSalle II*, 526 U.S. at 441–42 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[141] *Id.* at 441–42 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[142] *See In re Mallinckrodt*, 639 B.R. at 88-92 (best interests test satisfied where liquidation analysis established creditors would receive more under plan than in chapter 7 liquidation); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (finding plan satisfied section 1129(a)(7) of the Bankruptcy Code where, under the

section 1129(a)(7) of the Bankruptcy Code makes clear, the best-interests test applies only to non-accepting impaired claims or interests; if a class of claims or interests unanimously approves a plan, the best-interests test is deemed satisfied for all members of that class.[143]

96.    Here, no creditor has objected to confirmation of the Plan and so the best interests test is not even implicated. Regardless, the best interests test is satisfied because the Plan provides greater recoveries to creditors than they would receive in any Chapter 7 liquidation. *See* Liquidation Analysis attached as Exhibit A to the Disclosure Statement.

97.    These significant recoveries simply would not be available in a chapter 7 liquidation.  In that case, the Settlement with the Released Parties would terminate and the Liquidation Analysis reflects that chapter 7 liquidation would not generate proceeds necessary to even satisfy the Chapter 11 Administrative Expense Claims in full, let alone pay any Priority Claims and/or General Unsecured Claims, following the payment of Secured Claims. Accordingly, all creditors are receiving more property under the Plan than they would receive in a chapter 7 and section 1129(a)(7) is satisfied.

**H.    Section 1129(a)(8): All Impaired Classes Have Accepted the Plan**

98.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept a plan or not be impaired under the plan. Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-third in amount and more than one-half in number of the claims in their respective class that voted on the Plan.

---

terms of the plan, an impaired holder of a claim would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[143] *In re Mallinckrodt*, 639 B.R. at 88 (best interests test only applicable if there are "individual dissenters" to the debtor's plan).

99.    As disclosed in the Voting Report, all Impaired Classes accepted the Plan.[144]

Accordingly, the Plan satisfies section 1129(a)(8) of the Bankruptcy Code.

**I.    Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Administrative and Priority Claims**

100.    Section 1129(a)(9) of the Bankruptcy Code requires a plan to satisfy administrative

claims, other priority claims, and priority tax claims in full in cash unless the holder of a particular

claim agrees to a different treatment with respect to such claim.[145] Article III of the Plan provides

that all Allowed Administrative Claims and Priority Tax Claims shall be paid in full and in cash.[146]

Article II.B.2 of the Plan provides that all Priority Non-Tax Claims shall be paid in full and in

cash.[147] Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy

Code.

**J.    Section 1129(a)(10): At Least One Impaired Class of Claims Has Accepted the Plan**

101.    Section 1129(a)(10) of the Bankruptcy Code requires that at least one impaired

class of claims has voted to accept a plan if any class of claims is impaired under a plan. As

disclosed in the Voting Report, the Plan has been accepted by Class 3 and Class 5, and deemed

accepted by Class 6 of the Plan.[148] Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy

Code.

---

[144] As previously noted, Class 4 Non-Tort Litigation Claims) is a vacant class. Pursuant to Article II.B.9 of the Plan, vacant classes are eliminated for purposes of determining the Debtors' compliance with section 1129(a)(8). *See* Plan, Art. II.B.9 ("Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.").

[145] 11 U.S.C. § 1129(a)(9).

[146] Plan, Art. III.A and B.

[147] Plan, Art. II.B.2.

### K.    Section 1129(a)(11): The Plan Is Feasible

102.    Section 1129(a)(11) of the Bankruptcy Code requires the bankruptcy court to determine that a plan is feasible. This means that neither "liquidation" nor "the need for further financial reorganization" will occur after the plan is confirmed "unless such liquidation or reorganization is proposed in the plan."[149] Bankruptcy courts consider whether a plan is workable and has a reasonable likelihood of success when assessing feasibility.[150] But feasibility does not require a bankruptcy court to find that the plan is guaranteed to succeed.[151] Rather, a debtor needs to prove only that the plan is "more likely than not" feasible.[152] This standard is met when there the debtor provides reasonable assurance of success, which is a relatively low standard of proof.[153]

103.    Although the purpose of the feasibility test is to "protect against far-fetched visionary or speculative plans,"[154] "[c]ourts have made clear that "speculative prospects of failure cannot defeat feasibility."[155] In other words, "[t]he mere prospect of financial

---

[148] *See* Voting Report. *See* 11 U.S.C. § 1129(a)(10).

[149] 11 U.S.C. § 1129(a)(11).

[150] *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 167 (Bankr. D. Del. 2006); *In re NII Holdings*, 288 B.R. 356, 364 (Bankr. D. Del. 2002).

[151] *See Internal Revenue Serv. v. Kaplan* (*In re Kaplan*), 104 F.3d 589, 597 (3d Cir. 1997); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[152] See *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *Briscoe Enters.*, 994 F.2d at 1164; *CoreStates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).

[153] *See e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.") (internal quotation marks omitted); *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be a reasonable assurance of commercial viability.").

[154] *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013)

[155] *See WorldCom*, 2003 Bankr. LEXIS 1401, at *170; *see also In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003).

uncertainty cannot defeat confirmation on feasibility grounds."[156] Accordingly, courts have identified the following nonexclusive factors as probative with respect to the feasibility of a plan: (a) the adequacy of the capital structure, (b) the earning power of the business, (c) economic condition, (d) the ability of management, (e) the probability of the continuation of the same management, (f) the provisions of working capital, (g) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of provisions of the plan.

104.    As set forth in the Harris Declaration, the Plan satisfies the feasibility requirement of section 1129(a)(11). The distributions contemplated by the Plan, including the distributions to the Settlement Trust, the Professional Fee Reserve and the GUC Fund, will be fully funded upon the Effective Date of the Plan.[157] Further, the treatment provided to creditors under the Plan does not include sources of value that are dependent upon the success of the Reorganized Debtor, thereby reducing the risk that the Debtors will be unable to meet its future burdens.[158] The Plan provides that the Reorganized Debtors will continue operating their hotel subsequent to the Effective Date.[159] No party has objected to the Plan on grounds that the Debtors will be unable to meet their commitments under the Plan. Therefore, the Plan is feasible.

**L.      Section 1129(a)(12): The Plan Provides for Full Payment of Statutory Fees**

105.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under 28 U.S.C. § 1930, as determined by the court at the hearing on confirmation of the

---

[156] *Adelphia*, 341 B.R. at 421.

[157] Harris Decl. ¶16.

[158] *Id*.

[159] *Id*. at ¶18.

plan."[160] Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [28 U.S.C. § 1930]" are afforded priority as administrative expenses.[161] Article XII.Q of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date shall be paid in cash on the Effective Date, and that all such fees coming due after the Effective Date shall be paid when due.[162] Therefore, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

### M.    Sections 1129(a)(13)-(16) Are Inapplicable

106.    Various provisions of section 1129(a) are inapplicable to the Plan and need not be satisfied in order for the Plan to be confirmed. Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all retiree benefits (as defined in section 1114 of the Bankruptcy Code) after the Effective Date.[163] The Debtor does not have any obligations to pay such retiree benefits and, as such, section 1129(a)(13) does not apply to the Plan. Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to debtors that are individuals and therefore do not apply to the Debtor.[164] Finally, section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are nonprofit entities or trusts and therefore does not apply to the Debtor, which is a limited liability company that operated a commercial enterprise prior to the Petition Date.[165]

---

[160] 11 U.S.C. § 1129(a)(12).

[161] 11 U.S.C. § 507(a)(1).

[162] Plan, Art. XII.Q

[163] 11 U.S.C. § 1129(a)(13).

[164] 11 US.C. § 1129(a)(14) (requiring individual debtors to pay domestic support obligations through a plan); 11 U.S.C. § 1129(a)(15) (requiring individual debtors to make specified minimum payments to creditors objecting to a plan).

III.    **Debtors' Omnibus Reply to Plan Confirmation Objections filed by Insurance Companies**

107.    As the Plan objections filed by Nationwide and Samsung accurately describe, throughout the Chapter 11 Cases, Debtors' counsel has worked extensively with counsel for Nationwide and Samsung to identify, address and resolve many issues that have arisen in connection with the Plan, TDP, and Settlement Trust Agreement.

108.    Impressively, and as evidence of the good faith negotiations between the Debtors, Nationwide and Samsung, *only four objections remained* as of the Plan filing.  They assert that:

(a)    the Plan modifies contract rights in violation of bankruptcy and non-bankruptcy law -- the so-called "insurance neutrality" argument primarily because of the provisions of Article X.M.1 of the Plan and certain findings required as conditions precedent to confirmation of the Plan under Article IX.A.3.k and IX.A.3.m of the Plan;

(b)    the Plan improperly attempts to vest the Bankruptcy Court with jurisdiction of non-core, state law coverage determinations or the post-confirmation insurance coverage dispute jurisdictional argument;

(c)    (i) the Plan contains ambiguous, inconsistent and conflicting powers of the Settlement Trust Advisory Committee (the "*STAC*") over certain decisions of the Settlement Trustee as compared to the Settlement Trust Agreement, and (ii) that Settlement Trust Agreement improperly provides a higher standard of review for any post-confirmation settlements by and between the Settlement Trustee and a Settling Insurance Company and may only be approved if found to be in the "best interest of the beneficiaries of the Trust" rather than the Rule 9019 standard which requires only the lowest range of reasonableness standard; and

(d)    the Plan contains a waiver *in toto* of the statute of limitations applicable to the commencement of post-confirmation, state law tort actions by Direct Tort Claimants.  This fourth objection relating to the tolling of the statute of limitations is being reviewed and maybe resolved through continued negotiations by and among the Debtors, the Insurance Companies and the Direct Tort Claimants.

109.    The remaining Insurance Companies filed joinders in these objections to the Plan, with the exception of GAIC who, in addition to its joinder, added a limited objection rooted in a

---

[165] *See In re Sea Launch Co., L.L.C.*, No. 09-12153, 2010 Bankr. LEXIS 5283, at *41 (Bankr. D. Del. July 30, 2010) ("Section 1129(a)(16) by its terms applies only to corporations and trusts that are not moneyed, business, or commercial.") (internal citations omitted).

58

parochial interpretation of 11 U.S.C. § 1141(a) that argues that the Plan improperly binds "all parties in interest," not just the parties enumerated in section 1141(a) of the Bankruptcy Code – a deeper dive into a portion of Nationwide and Samsung's insurance neutrality argument.

110.    The Debtors are in discussions with Nationwide and Samsung to agree upon revised language that is acceptable to the Debtors, holders of Direct Tort Claims and the Insurance Companies with regard to Nationwide and Samsung's 4th objection set forth in subsection (d) above.

111.    The Debtors respond to the remaining three objections as follows.

A.    **The Plan is Insurance Neutral**

112.    The Insurance Companies erroneously argue that the Plan modifies contracts rights in violation of bankruptcy and non-bankruptcy law and, therefore, cannot be confirmed.   In support of their argument, the Insurance Companies stretch Third Circuit case law and cite to "recent cases" *from 2011 and 2013* regarding "insurance neutrality*,"* while ignoring the more recent decisions in Boy Scouts of America and Delaware BSA, LLC,[166] Millennium Lab Holdings II, LLC,[167] and Mallinckrodt PLC, et al.[168] (to name a few) which reflect a current judicial thinking and analysis of "insurance neutrality."   The bottom line: insurance neutrality is a "standing concept," *not a plan confirmation veto tool*.   Boy Scouts of America, [cite at p. 231]. "While it is a tool debtors may choose to use and may offer significant benefits to a bankruptcy case, 'insurance neutrality' is not required." Id.

---

[166] *In re Boy Scouts of America*, 642 B.R. 504 (Bankr. D. Del. 2022), aff'd,  *Nat'l Union Fire Ins., Co. of Pittsburgh, Pa v. Boy Scouts of Am. (In re Boy Scouts of Am.)*, 650 B.R. 87 (D. Del. 2023).

[167] *Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559 (D. Del. 2018), aff'd, *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3rd Cir. 2019).

[168] *In re Mallinckrodt PLC.*, Case No. 20-12522-JTD (Bankr. D. Del. Feb. 3, 2022).

113.    As such, the Insurance Companies' reliance on "insurance neutrality" as a basis for rejecting the Plan is misguided and without support.  "Insurance neutrality" is simply a matter of standing; it is not a requirement under the Bankruptcy Code for Plan confirmation. Even so, the objections raised by the Insurance Companies under the guise of "insurance neutrality" should be overruled.

114.    The Insurance Companies cite three Plan provisions which allegedly turn the "principles regarding insurance neutrality on their head."[169] The first provision is title "Insurance Provisions" at Article X.M. which provides:

> 1. *Except for the Insurance Assignment, or as otherwise provided in the Bankruptcy Code, applicable law, or the findings made by the Bankruptcy Court in the Confirmation Order*, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights or obligations under an Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of the Non-Settling Insurance Companies relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law.

Plan, D.I. 487, Article X.M (emphasis added)

115.    Per their logic, the qualifying language (in italics above), somehow modifies Insurance Companies' contract rights under their policies because the "insurance neutrality" provision is subject to the Bankruptcy Code, applicable law, or the findings made by the Bankruptcy Court in the Confirmation Order.[170]

---

[169] Objection of Nationwide Mutual Insurance Company and Harleysville Preferred Insurance Company to Confirmation of Debtors' Second Amended Plan (the "***Nationwide Obj.***") ¶¶ 6-7 [D.I. 520]; *See* Samsung Fire & Marine Insurance Co., Ltd. (U.S. Branch)'s Objection to Confirmation of Debtors' Second Amended Plan (the "***Samsung Obj.***") ¶2.a [D.I. 521].

[170] Id.

116.    However, on its face, Article X.M is clear that the Insurance Companies'
contractual rights (to the extent any exist under applicable state law) are *not* subject to
modification, amendment, or supplementation, nor does the Plan or any of the Plan Documents
make any attempt to do so. Nonetheless, the Insurance Companies focus on the fact that Article
X.M of the Plan exempts "the Bankruptcy Code, applicable law, the findings made by the
Bankruptcy Court in the Confirmation Order," from its ambit.[171] Here, Article X.M and the
additional protective insurance provisions found in the TDP[172] (collectively, the "Insurance
Neutrality Provisions") provide an intended one-two punch confirming that all of the rights and
remedies of any Non-Settling Insurance Companies are preserved.

117.    Interestingly, while the Insurance Companies cite to some "recent" Delaware
bankruptcy cases *from 2011 and 2013* in support of their arguments, they chose to ignore the
more recent Boy Scouts of America and Delaware BSA, LLC case which plan was confirmed by
order of the Bankruptcy Court for the District of Delaware in July of 2022 and affirmed on appeal
by the District Court of Delaware in March of 2023.[173]

118.    The Delaware Bankruptcy Court confirmed the Boy Scout debtors' plan with a
substantially similar insurance neutrality provision (Article X.M) and disposed of the objections
thereto from "Certain Insurers" in the case.

119.    Specifically, in addressing the insurance neutrality arguments, the Delaware Court
stated that the

---

[171] *Id.*; neither the Insurance Companies, nor any other party, objects to the Insurance Assignment which is a
fundamental aspect of the Plan and an important element of the Debtors' Settlement Trust Contribution to the
Settlement Trust.

[172] TDP at Article V.C titled Assignment of Insurance Rights.

[173] *Nat'l Union Fire Ins., Co. of Pittsburgh, Pa. et al v. In re Boy Scouts of Am. & Delaware BSA, LLC et al (In re Boy
Scouts of Am. & Delaware BSA, LLC),* No. 20-10343-LSS, 2023 WL 2662992 (D. Del. Mar. 28, 2023).

> Debtors are correct that 'insurance neutrality' is a standing concept that appears to have arisen in the context of mass-tort cases in order to prevent insurance companies from objecting to confirmation. The two cases cited…arise in just that context and discuss whether the specific language in the relevant plan leaves insurers' rights unimpaired such that they do not have standing to object to confirmation. In *Global Industrial*, the court ruled that the plan was not 'insurance neutral' as that term was used in *Combustion Engineering* and remanded the case directing the court to hear the objecting insurers' confirmation objections.[174]

120.    Significantly, and *contrary to the Insurance Companies' representation*[175], the Delaware Bankruptcy Court recognized that the Third Circuit (in *Combustion Engineering*) does not require or "hold that a plan had to be insurance neutral."[176] The court continued that these decisions do not "guarantee an insurance company an 'insurance neutral plan,' rather these decisions recognize that if a plan is not 'insurance neutral,' insurance companies have standing (at either the bankruptcy or appellate level, as applicable) to be heard."[177] In the instant Chapter 11 Cases, just like in the Boy Scouts case, the insurance neutrality argument "does not aid insurers here."[178]

121.    At the granule level, the Insurance Companies do not (nor could they) make any cogent argument that their contractual rights or defenses should not be subject to the Bankruptcy Code or applicable law. By filing their Chapter 11 Cases, the Debtors chose the benefits, burdens and protections under Chapter 11 and, like it or not, the Bankruptcy Code applies to all aspects of their cases, including the Confirmation of the Plan. Similarly, "applicable law" *must* apply…if

---

[174] *Boy Scouts of America* at p.249.

[175] Nationwide Obj. ¶3 [D.I. 520]; the palpable irony of the Insurance Companies turning the "foregoing principles regarding insurance neutrality on their head" cannot be ignored. *See* Nationwide Obj. ¶6.

[176] *Boy Scouts of America* at p.250.

[177] *Id.*

[178] *Id.*

it did not, no doubt the Insurance Companies could actually make a sustainable insurance neutrality argument. Accordingly, the Insurance Companies' only real concern must be the "findings made by [this] Bankruptcy Court in the Confirmation Order."[179]

122.    Specifically, the Insurance Companies argue that the possibility that their contractual rights "may not be preserved" by the Insurance Neutrality Provisions is compounded by certain proposed "findings" that this Court is being asked to make pursuant to the Plan.[180]

123.    The Insurance Companies point to two proposed findings in the Plan at Article IX.A.3 that allegedly attempt to abrogate their rights:

> *(k) the Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of res judicata and collateral estoppel, and section 1141 of the Bankruptcy Code (and related authority); and*

> *(m) the right to payment that the holder of a Tort Claim has against the Debtors or another Released Party is the amount of such Tort Claim as determined under the Trust Distribution Procedures and is not the Debtors' Settlement Trust Contribution; provided, however, that nothing herein shall determine that any insurer is obligated to pay the Debtors' or another Released Party's liability so determined under the Trust Distribution Procedures.*

Plan, D.I. 487, Article IX.A.3(k) and (m).[181]

124.    The Debtors believe that each of the Proposed Findings in Art. IX.A.3., including (k) and (m) are necessary for Plan Confirmation, and the contention that these findings destroy

---

[179] Nationwide Obj. ¶7; *See* Samsung Obj. ¶2.a.

[180] *Id.*

[181] *Id.* at ¶¶ 8-10. The Debtors note that the Insurance Companies mistakenly reference (1) Art.IV.A.3 (instead of Art.IX.A.3) in par. 8 of the Nationwide Obj. and (2) subsection (l) of Art.IX.A.3 (instead of subsection (m)) in par.9 of the Nationwide Obj., but responded as if the correct sections were referenced; moreover, for the record, the Debtors wish to correct the Insurance Companies' inaccurate statement that the "each of documents that comprises the Plan Supplement…has not yet been made public" at Nationwide Obj. ¶8.  The Notice of Filing of Plan Supplement, together with all Exhibits (A through F), was timely filed with this Court on July 14, 2023 [D.I. 512].

the Plan's "insurance neutrality" on the basis that it modifies contractual provisions in the applicable insurance policies is without basis. Again, the Plan and the TDP actually preserve all of the rights under the insurance policies, as well as the ability of the Non-Settling Insurance Companies to assess those rights in any future insurance coverage litigation.

### GAIC's Joinder and Limited Objection

125.     As noted above, GAIC filed a joinder in the Nationwide Obj. and Samsung Obj. and added a limited objection rooted in a parochial interpretation of 11 U.S.C. § 1141(a) that argues that the Plan improperly binds "all parties in interest," not just the parties enumerated in section 1141(a) of the Bankruptcy Code.  At its core, this argument is simply an extension of the Nationwide and Samsung objections, and thus addressed by the Debtors' arguments above; however, for the record, Debtors must response to some misleading statements therein.

126.     At the outset, GAIC attempts to make "hay" about the fact that the "Debtors first provided GAIC with notice of the Second Amended Plan on June 26, 2023.  Debtors had not provided GAIC with notice of any previous Plan of Reorganization at all."[182]  This is true.  Of course, GAIC fails to mention, or perhaps recognize, that under section 1125(b) of the Bankruptcy Code, the Debtors were prohibited from soliciting their Plan until their Disclosure Statement was approved by this Court on June 15, 2023.[183] The Debtors timely provided a copy of the Plan, together with the Court approved solicitation materials, in accordance with the Solicitation Procedures Order.  That said, had GAIC filed a Notice of Appearance in these bankruptcy cases in 2022, after they were mailed written notice of bankruptcy cases and notice of claims against

---

[182] Limited Objection of Great American Insurance Company of New York to Confirmation of the Second Amended Joint Plan of Reorganization (the "**GAIC Obj.**") ¶ 5 [D.I. 524].

[183] *See* Solicitation Procedures Order [D.I. 476].

their policies, GAIC would have received notice via ECF of earlier iterations of the Plan filed with the Bankruptcy Court.

127.    Moreover, Debtors strenuously object to GAIC's characterization of a "sudden decision" to allegedly put GAIC "on notice of an impending plan of reorganization…calculated so that GAIC would be on notice of, and would be bound to, the findings and conclusions contained in the plan."[184]

128.    GAIC fails to mention that the Debtors provided them written notice **on January 14 and January 31, 2022**, that GAIC's insurance policies are potentially responsive to the Direct Tort Claims of T.S. and B.S., and that the Debtors demanded GAIC's participation in the mediation of the Chapter 11 Cases.  GAIC ignored these requests.  It simply failed or refused to respond.  Finally, on or about, December 13, 2022 (approx. 11 months later), GAIC finally acknowledged notice of these Direct Tort Claims, but has not, to date, provided a coverage position. Any wound here is self-inflicted.[185]

129.    GAIC's argument that the Plan does not bind it because of the plain meaning of Section 1141(a) of the Bankruptcy Code borders on the absurd.  In sum, GAIC states that since it "is not a creditor, debtor, or security holder," nor is it "acquiring property under the Second Amended Plan and is not a general partner in the Debtors…the Bankruptcy Code does not permit a finding that the Second Amended Plan could be binding on [it]."[186]

130.    Debtors agree that Section 1141(a) identifies specific parties who shall be bound by the provisions of the Plan, but by no means is that list meant to be or, actually is, an exclusive

---

[184] GAIC Obj. ¶6.

[185] GAIC admits that the Debtors provided it with access to proofs of claim for the Tort Claims. GAIC Obj. ¶19.

[186] *Id.* at ¶18.

list. Extending GAIC's parochial reading of Section 1141(a), and its logic to other typical parties-in-interest in a chapter 11 case, a plan could never bind a party who appears and/or participates in litigation affected by a plan or an order of confirmation or "is in privity" with such a litigant, like the Insurance Companies herein.[187] GAIC's argument must fail, and its objection overruled.

131.    In sum, pursuant to the Insurance Neutrality Provisions, the Plan preserves all of the Non-Settling Insurance Companies' rights and remedies, if any, available, and it does not rewrite or modify any of the applicable insurance policies in contravention of "insurance neutrality" or any requirements in the Bankruptcy Code. When read as a whole and in connection with the TDP, the Plan is, in fact, "insurance neutral" and consistent with Third Circuit law because it preserves all of the rights and remedies of the Non-Settling Insurance Companies.

**B.     The Plan does not improperly vest the Bankruptcy Court with jurisdiction of non-core, state law coverage determinations**

132.    The Insurance Companies also object to the Plan based upon their misinterpretation of, or overreaching attempt to further limit, the scope of Article XI.C.16 regarding the Bankruptcy Court's retention of post-confirmation insurance coverage disputes.[188] The Plan provides that the Bankruptcy Court will "retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to:

> hear and determine the Insurance Actions (**except for the Insurance Actions pending before the District Court which the District Court shall determine**), any Settlement Trust Cause of Action and any similar claims, Causes of Action or rights of the Settlement Trust to construe and take any action to enforce any Tort Insurance Policy, and to issue such orders as may be necessary for the

---

[187]  *In re Dycoal, Inc.*, 327 B.R. 220 (W.D. Pa. 2005) ("Such exception is when an individual or entity appears and participates in litigation regarding an issue dealt with by a confirmed plan or confirmation order, or is in privity with such an individual or entity, such that such individual or entity (a) rises to the level of a party with respect to such plan or order, and (b) is thus subsequently bound by such plan or order by virtue of an application of the doctrine of *res judicata* regardless of whether such individual or entity is named within § 1141(a)"); *see also In re WorldCom, Inc.*, 401 B.R. 637 (Bankr. S.D.N.Y. 2009).

[188] Nationwide Obj. ¶¶11-14; *See* Samsung Obj. ¶2.b.

execution, consummation and implementation of any Tort Insurance Policy, and
to determine all questions and issues arising thereunder; provided, that such
retention of jurisdiction shall not constitute a waiver of any right of a Non-Settling
Insurance Company to seek to remove or withdraw the reference of any Insurance
Action filed after the Effective Date (emphasis added)

Plan, D.I. 487, Article XI.C.16.

133.     In support of their "post-confirmation insurance coverage disputes jurisdictional

argument," the Insurance Companies reason that "insurance coverage disputes are not core

proceedings."[189]   The Debtors agree.   These matters are "related to" and, thus, non-core matters

which are capable of being heard by the Bankruptcy Court under many circumstances pursuant

to the *Amended Standing Order of Reference* (E.D. PA November 8, 1990) (referring all

bankruptcy cases and their attendant civil proceedings to bankruptcy judges).

134.     Next, the Insurance Companies note that certain "[i]nsurance cover actions against

the Debtors' insurers (including Nationwide [and Samsung]) could have been filed – and indeed,

previously were filed – in a non-bankruptcy forum completely apart from and prior to the

bankruptcy filing."[190]   Again, the Debtors agree and specifically carved out of their post-

confirmation jurisdiction provision the "Insurance Actions pending before the District Court

which the District Court shall determine" to ensure those actions are resolved where they were

commenced.[191]

---

[189] *Id*. at ¶11.

[190] *Id*. at ¶12.

[191] Plan, Art. XI.C.16; Debtors acknowledge that the Insurance Actions referenced therein are now before the Third
Circuit Court of Appeals by virtue of the District Court's March 20, 2023 Insurance Actions Order and the Debtors
appeal of the District Court's May 16, 2023 Stipulated and Final Judgment in favor of Samsung, Nationwide, ACE
and which effectively disposed of other related cover litigation disputes with PIIC and Capitol Specialty Insurance
Corp. *See* Disclosure Statement, Art.III.M,

135.    Moreover, to maintain the Plan's "insurance neutrality" in Art.XI.C.16, the Debtors specifically provide "that such retention of jurisdiction shall not constitute a waiver of any right of a Non-Settling Insurance Company to seek to remove or withdraw the reference of any Insurance Action filed after the Effective Date."   In other words, if the Settlement Trustee commences a post-confirmation insurance coverage in the Bankruptcy Court, a Non-Settling Insurance Company may elect, and has every right, to file its motion to withdraw the reference which motion shall be heard and determined by the District Court. The Non-Settling Insurance Company's contractual rights and defenses remain unscathed.   Just because the Insurance Companies do not like this Plan provision does not render it objectionable and the Plan unconfirmable.

**C.    The Plan's language regarding the STAC's powers is not ambiguous, nor inconsistent, with the Settlement Trust Agreement and the settlement standard set forth in the Settlement Trust Agreement is appropriate under the circumstances of these Chapter 11 Cases**

   (i)    Unambiguous mechanism to approve a post-effective date settlement with an insurance company or *Much Ado About Nothing*[192]

136.    The Insurance Companies also object to the Plan based upon a *perceived inconsistency* in language between the Plan, Art.IV.H and the Settlement Trust Agreement, Section 5.15, relating to the mechanism or procedures surrounding the Settlement Trustee's approval of a proposed post-effective date insurance settlement (a "PEDI Settlement").[193]

---

[192] *Much Ado About Nothing* is, of course. a comedy by William Shakespeare thought to have been written in 1598 and 1599. Wikipedia (the Free Encyclopedia).  The Debtors reference to this classic play underscores the literal meaning of the play's title and not "the secrets and trickery that form the backbone of the play's comedy, intrigue, and action." *Id*. There is nothing up the Debtors' proverbial sleeve. As is detailed in both the Plan and the Settlement Trust Agreement, the Settlement Trustee has the independent ability to seek Bankruptcy Court approval of a PEDI Settlement without the consent or approval of a majority of the STAC.

[193] Nationwide Obj. ¶¶15-17; *See* Samsung Obj. ¶2.c.

137.     The Debtors agree that, *like many other provisions across the Plan Documents*, due to the specific context and inherent differences between the Plan and the Settlement Trust Agreement, the language utilized to describe the "mechanism" or procedure by which the Settlement Trustee shall seek approval of a PEDI Settlement is not identical.

138.     That said, both documents are clear.  The Settlement Trustee has two paths to seek approval of a PEDI Settlement.  First and foremost, a PEDI Settlement must be acceptable to the Settlement Trustee in his independent and sole discretion.  Once a PEDI Settlement is acceptable to the Settlement Trustee, the PEDI Settlement must either (a) be approved by the majority of the STAC or (b) be approved by the Bankruptcy Court.[194]

139.     If the PEDI Settlement is approved by the majority of the STAC, the Settlement Trustee shall follow a notice procedure giving all Rule 2002 Parties notice of the PEDI Settlement and the opportunity to object.  If there is no timely objection, the PEDI Settlement is deemed approved and the Insurance Company shall be deemed a "Settling Insurance Company" and a "Released Party" for all purposes under the Plan.  If a timely objection to the PEDI Settlement is filed, the Bankruptcy Court shall determine such objection.[195]

140.     If the PEDI Settlement is not approved by a majority of the STAC, the Settlement Trustee *shall* submit the PEDI Settlement to the Bankruptcy Court for approval with notice to all Rule 2022 Parties and the affected parties.[196]

141.     The Insurance Companies' concern or belief that the Plan gives the STAC some veto power over the approval of a PEDI Settlement is unfounded.  Both the Plan and the

---

[194] Plan, Art.IV.H.1; Settlement Trust Agreement, Section 5.15(a).

[195] Plan, Art.IV.H.1; Settlement Trust Agreement, Section 5.15(b).

[196] Plan, Art.IV.H.2; Settlement Trust Agreement, Section 5.15(c)

Settlement Trust Agreement state otherwise, and the Debtors hereby confirm the above-outlined

mechanism and procedures detailed above.

> (ii)     The settlement standard to be employed by the Bankruptcy Court should be
> Bankruptcy Rule 9019 modified by two additional factors - the entire fairness
> standard and - "the best interest of the beneficiaries of the Trust"

142.    The Insurance Companies correctly observe that the Settlement Trust Agreement

provides that, if Bankruptcy Court approval of a PEDI Settlement is required, the Bankruptcy

Court should consider (i) the entire fairness standard and (ii) find the PEDI Settlement to be in

the best interest of the beneficiaries of the Settlement Trust.[197]

143.    The Debtors believe that a "more rigorous" standard like the entire fairness standard

vs. the "lowest range of reasonableness" standard found in Bankruptcy Rule 9019 is not only

appropriate, but required in light of the Torts Claims at issue, and the essential fact that the

Settlement Trust is established for and should have the best interests of the beneficiaries of the

Trust (the Direct Tort Claimants) in mind.  As courts in the Third Circuit have long recognized,

"'all other factors relevant to a full and fair assessment of the wisdom of the proposed

compromise' should be considered as well."[198]  The "entire fairness standard" requires the

Bankruptcy Court to scrutinize all aspects of PEDI Settlement to ensure fairness.

144.    The Insurance Companies' concerns about the Bankruptcy Court's review

standards are unfounded.  The Bankruptcy Court is both experienced and well-positioned to

determine whether a proposed PEDI Settlement is fair and "in the best interests of the

---

[197] Nationwide Obj. ¶¶18-21; *See* Samsung Obj. ¶2.c; Debtors object to the unsupported characterization that this
provision was a "deliberate misdirection."  The Debtors have and continue to negotiate the voluminous objections and
concerns raised by the Insurance Companies in good faith. *See* Settlement Trust Agreement, Section 5.15(c).

[198] *In re Nutritional Sourcing Corp.*, 398 B.R. at 833 *citing In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998)
(quoting *TMT Trailer Ferry Inc. v Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *see also In re Louise's
Inc.*, 211 B.R. 798, 801 (D. Del. 1997)) (noting that the court must determine whether a"compromise is fair, reasonable, and in
the interest of the estate.)"

beneficiaries of the Trust," and more than capable of sorting through any possible objections to a PEDI Settlement to assess and evaluate the fairness of a PEDI Settlement.  Indeed, the Third Circuit Court of Appeals has recognized that "[u]nder the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, *the parties who did not settle*."[199]  The adoption of the entire fairness standard does not give a "veto right [to] the STAC or the individual plaintiffs" over any PEDI Settlement.[200]   The ultimate decision to approve a PEDI Settlement rests with the Bankruptcy Court.

## CONCLUSION

For all of the reasons set forth herein, the Debtors requests that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code, overrule any objections, and grant such other and further relief as is just and proper.

## RESERVATION OF RIGHTS

The Debtors reserve all rights to supplement, amend, or modify this memorandum (and the exhibits attached hereto), and any other documents filed in connection with confirmation of the Plan. The Debtors further reserve all rights and defenses to respond to at the confirmation hearing any and all objections or supplemental objections whether or not addressed in this memorandum.

*[Remainder of page intentionally left blank]*

---

[199] *Id.* at 833 citing *In re Nutraquest*, 434 F.3d 639, 645 (3d. Cir 2006) (emphasis added).

[200] Nationwide Obj. ¶¶18-21.

**KARALIS PC**

By:    /s/ Aris J. Karalis

       Aris J. Karalis, Esquire
       Robert W. Seitzer, Esquire
       Robert M. Greenbaum, Esquire
       1900 Spruce Street
       Philadelphia, PA  19103
       215-546-4500

       *Attorneys for the Debtors*